IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16- |
| v. | : | DATE FILED: _____ |
| DINO PAOLUCCI | : | VIOLATIONS:<br>18 U.S.C. § 1343 (wire fraud - 9 counts) |
| | : | 18 U.S.C. § 371 (conspiracy - 1 count)<br>15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. |
| | : | § 240.10b-5 (securities fraud - 1 count)<br>18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

## INDICTMENT

### COUNTS ONE THROUGH NINE

THE GRAND JURY CHARGES THAT:

### BACKGROUND

At all times material to this indictment:

1. Defendant DINO PAOLUCCI, a Canadian citizen, was a stock promoter. Defendant PAOLUCCI promoted penny stock companies using various business names under his control, including the Bull Exchange and Market Bulls. In addition, defendant PAOLUCCI was closely associated with a public company named D Mecatronics, Inc., and its wholly-owned subsidiary D&R Technology, Inc., which manufactured automotive parts.

2. Person Number 1 ("Person No. 1"), known to the Grand Jury, was a businessman who participated in the promotion of certain penny stocks, often operating through

1

entities that he owned and controlled, such as Global Media Fund International, Inc. ("Global Media") and Sono Associates, LLC.

3. Frank J. Morelli, III, charged elsewhere, was a business consultant and stock promoter who operated through several businesses and entities. In or about February 2010, the U.S. Securities and Exchange Commission (the "SEC") filed a civil enforcement action against Morelli and others in connection with the illegal issuance and public sale of the shares of Greenstone Holdings, Inc. In or about June 2011, pursuant to Morelli's consent, the court entered a final judgment against him in this action that, among other things, barred Morelli from participating in an offering of a penny stock. The order defined a penny stock as an equity security that has a price of less than five dollars.

4. Louis Buonocore, charged elsewhere, was a business consultant and stock promoter who operated through an entity named Bay State Financial Services Corp. ("Bay State Financial"), a Massachusetts-based investor relations firm. Buonocore was often a business partner of defendant DINO PAOLUCCI.

5. Person Number 2 ("Person No. 2"), known to the Grand Jury, was a businessman based on Long Island, New York.

6. Ecoland International, Inc. ("ECIT") was a Nevada corporation that changed its named to Novus Robotics, Inc. ("NRBT") in or about March 2012. The corporation's principal place of business was Sandton, South Africa, until February 2012, after which it changed ownership and relocated to Mississauga, Ontario. According to ECIT's public filings, in 2011 and early 2012, it marketed and sold cave bat guano. In February 2012, the

entities that he owned and controlled, such as Global Media Fund International, Inc. ("Global Media") and Sono Associates, LLC.

3. Frank J. Morelli, III, charged elsewhere, was a business consultant and stock promoter who operated through several businesses and entities. In or about February 2010, the U.S. Securities and Exchange Commission (the "SEC") filed a civil enforcement action against Morelli and others in connection with the illegal issuance and public sale of the shares of Greenstone Holdings, Inc. In or about June 2011, pursuant to Morelli's consent, the court entered a final judgment against him in this action that, among other things, barred Morelli from participating in an offering of a penny stock. The order defined a penny stock as an equity security that has a price of less than five dollars.

4. Louis Buonocore, charged elsewhere, was a business consultant and stock promoter who operated through an entity named Bay State Financial Services Corp. ("Bay State Financial"), a Massachusetts-based investor relations firm. Buonocore was often a business partner of defendant DINO PAOLUCCI.

5. Person Number 2 ("Person No. 2"), known to the Grand Jury, was a businessman based on Long Island, New York.

6. Ecoland International, Inc. ("ECIT") was a Nevada corporation that changed its named to Novus Robotics, Inc. ("NRBT") in or about March 2012. The corporation's principal place of business was Sandton, South Africa, until February 2012, after which it changed ownership and relocated to Mississauga, Ontario. According to ECIT's public filings, in 2011 and early 2012, it marketed and sold cave bat guano. In February 2012, the

corporation completed the acquisition of the shares of D&R Technology and transitioned into engineering, designing, and manufacturing robotics and automation technology solutions.

7. The stock of ECIT/NRBT was registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act. Its securities were publicly quoted on the OTC Bulletin Board ("OTCBB") under the symbol "ECIT" until approximately April 2012, when the symbol was charged to "NRBT." The companies trading on the OTCBB tend to be extremely small, and the stock in those companies tends to be closely held (that is, owned by a small number of individuals) and thinly traded (that is, traded far less frequently than stocks in larger companies on larger exchanges).

8. The SEC was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities quoted on the OTCBB. ECIT/NRBT stock was registered with the SEC.

9. Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false or misleading statements and/or the failure to disclose material information to the SEC and the public. Federal securities laws and regulations also prohibit the manipulation of stock through, among other things, sales made at the times and/or at prices set by those trading the stock rather than by market forces.

10. From in or about at least Spring 2011 through in or about 2012, in the Eastern District of Pennsylvania, and elsewhere, defendant

**DINO PAOLUCCI**

together with Person No. 1, Frank J. Morelli, III, Louis Buonocore, Person No. 2, and others known and unknown to the Grand Jury, devised and intended to devise, and aided and abetted, a scheme to defraud ECIT/NRBT shareholders, and to obtain money and property, by means of knowingly false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

It was part of the scheme that:

11. Defendant DINO PAOLUCCI, Person No. 1, Frank J. Morelli, III, Louis Buonocore, Person No. 2, and others known and unknown to the Grand Jury planned to obtain money by inflating the volume of trading in and/or the price of ECIT/NRBT stock through misleading marketing and stock manipulation, and by preventing the SEC from detecting the scheme or taking regulatory enforcement action against them. In order to do this, the schemers took various actions, including the following:

    a. Agreeing to purchase as a group all but approximately 200,000 of ECIT's approximately 88 million restricted and free trading shares so that the schemers would control both the company's restricted shares (which cannot be freely traded in the market) and its free trading shares (which can be freely traded). This allowed the schemers to control the timing, volume, and price of stock available for trading so that these free trading shares could be sold when the schemers promoted the stock.

4

    b. Causing ECIT's free trading shares to be purchased in the name of Person No. 1's entities, Global Media and Sono Associates, thereby concealing that Person No. 1 was holding these free trading shares on behalf of not only himself, but also defendant PAOLUCCI, Morelli, and later Buonocore pursuant to a secret, unwritten agreement that was hidden from the market and the SEC.

    c. Causing millions of ECIT's free trading shares to be deposited in offshore brokerage accounts that Person No. 1, with the assistance of Person No. 2, controlled on behalf of the schemers, thereby enabling the schemers (1) to conceal their joint ownership and control of the vast majority of ECIT's free trading shares, (2) to coordinate their sale of these shares during their promotion of ECIT, and (3) to hide the participation of several schemers, such as defendant PAOLUCCI, Morelli, and Buonocore, in the manipulation of this stock.

    d. Running stock promotions to create the false impression to investors that there was market interest in ECIT/NRBT stock when there was little or no interest in the stock.

    e. Concealing from investors and the SEC that the schemers had paid for or initiated the stock promotions.

    f. Coordinating the issuance of press releases with the stock promotions, in order to increase trading volume, thereby: (1) creating the false impression to investors that there was market interest in ECIT/NRBT stock when there was little or no interest in the stock; and (2) limiting scrutiny by the SEC by making it appear that increases in the volume of ECIT/NRBT stock traded were justified by the press that the company generated.

    g. Avoiding scrutiny by the SEC by (1) transferring ECIT's free trading stock to Person No. 1's entities in order to conceal the involvement of defendant PAOLUCCI and Morelli and the true ownership of the stock; and (2) creating false and misleading documents and correspondence to conceal the true nature of the schemers' activities.

    h. Engaging in manipulative and deceptive securities transactions, including pre-arranged sales and purchases of ECIT stock between and among themselves or other individuals under their control, in order to create the false appearance of an active and liquid market in ECIT stock and to drive up the share price and/or the volume of shares sold.

    i. Using the wires and facilities of interstate and foreign commerce in furtherance of the scheme.

## I. The Schemers Reach an Agreement

  12. In or about Spring 2011, defendant DINO PAOLUCCI, Person No. 1, and Frank J. Morelli, III, met in the Dominican Republic and discussed defendant PAOLUCCI's desire to merge D&R Technology into a public shell company. D&R Technology was a wholly owned subsidiary of D Mecatronics, a public company owned in large part by defendant PAOLUCCI, his father, and a close associate.

  13. In or about May and June 2011, defendant DINO PAOLUCCI, Person No. 1, and Frank J. Morelli, III, worked to find a suitable public shell company for the merger.

  14. On or about July 18, 2011, Person No. 2 emailed Person No. 1 and told Person No. 2 that he had identified ECIT as a good OTCBB company for the planned merger. Person No. 1 agreed that ECIT was a good fit because it did not have a lot of debt or other financial problems.

15. Soon afterwards, Person No. 2 sent Person No. 1 a written summary containing the following details about ECIT as a potential acquisition candidate:

    a. ECIT was incorporated in Nevada;

    b. it filed reports with the SEC;

    c. it did not have outstanding liabilities or legal issues;

    d. it had 88,650,000 outstanding shares of stock, with 22 million "deliverable free trading" shares; and

    e. its stock recently traded for $0.21.

16. Around this time, defendant DINO PAOLUCCI agreed that ECIT was a suitable company for the scheme.

## II. The Acquisition of ECIT

17. Over the last two weeks of July 2011, Person No. 1, as the schemers' nominee and with defendant DINO PAOLUCCI's input and approval, negotiated with the controlling shareholders of ECIT to purchase their interest in the company.

18. In or about late July 2011, the schemers entered into a preliminary agreement with shareholders of ECIT to purchase the vast majority of the company's shares, including the control block of 62 million restricted shares and approximately 26,450,000 free trading ECIT shares, for approximately $485,000. Under the terms of this agreement, the schemers arranged to purchase all but 200,000 of ECIT's approximately 88 million shares.

19. Around this time, defendant DINO PAOLUCCI, Person No. 1, and Frank J. Morelli, III, reached a secret, unwritten agreement to launch a market manipulation scheme by purchasing ECIT's shares, promoting and selling its stock, and distributing the proceeds.

Specifically, the schemers, including defendant PAOLUCCI, Person No. 1, and Morelli agreed to the following:

 a. a party that they controlled would purchase ECIT's restricted shares for approximately $275,000 and then combine the public company ECIT with the private company D&R Technology;

 b. Person No. 1 would act as the other schemers' nominee because the SEC had barred Morelli from trading penny stocks and defendant PAOLUCCI's affiliation with D&R Technology limited his ability to sell free trading stock in the combined company;

 c. as the group's nominee, Person No. 1 would cause his entities to purchase the vast majority of ECIT's free trading shares;

 d. defendant PAOLUCCI, with the assistance of the other schemers, would conduct a promotional campaign using email blasts, internet promotions, and the issuance of press releases hyping the company and its stock, but not informing potential investors about various material facts, including the schemers' control of ECIT's stock, their responsibility for the promotional campaign, and their intent to sell their own stock;

 e. the schemers, acting primarily through Person No. 1, would sell company stock in coordination with the promotional campaign; and

 f. the schemers would divide the stock sale proceeds, with defendant PAOLUCCI receiving approximately 60% and Person No. 1 and Morelli splitting the remainder of the proceeds.

Neither the schemers nor ECIT disclosed this secret, unwritten agreement to the market at this point in time or subsequently.

20. On or about August 1, 2011, Person No. 1 caused his entity Global Media to send approximately $55,000 to an escrow agent as an initial payment for ECIT's free trading and restricted shares.

21. On or about August 12, 2011, Person No. 1 caused Global Media to send an additional $100,000 to the escrow agent as a further payment for ECIT's free trading and restricted shares.

22. On or about August 12, 2011, Person No. 1, as the schemers' nominee, also caused his entities, Global Media and Sono Associates, to enter agreements to purchase approximately 26,450,000 free trading ECIT shares from five shareholders. Person No. 1 served as a nominee for defendant DINO PAOLUCCI and Frank J. Morelli, III, to conceal their participation and roles in this scheme.

23. On or about August 25, 2011, Person No. 1 caused approximately four million of these free trading ECIT shares to be deposited into Global Media's brokerage account at Spencer Edwards Securities Inc. ("Spencer Edwards").

24. In or about September 2011, Person No. 1, with the assistance of Person No. 2, also rushed to have additional free trading ECIT shares deposited at an offshore brokerage account that Person No. 1 controlled so that the schemers would be prepared to sell these shares during the planned promotion of ECIT stock scheduled for early October 2011. As a result of these efforts, Person No. 1 deposited approximately two million additional free trading ECIT shares into this offshore account.

### III. The Scheme To Manipulate Stock

25. On or about September 28, 2011, immediately before the schemers planned to begin promoting ECIT through email blasts from defendant DINO PAOLUCCI's stock promotion websites and the issuance of coordinated press releases, Person No. 1 and Person No. 2, on behalf of the other schemers, conducted what they called a "test run" to ensure that they had "worked out the kinks." As part of this effort, they sold a small amount of ECIT stock from Global Media's Spencer Edwards account. Person No. 1 and Person No. 2, however, were unable to sell any shares of ECIT stock from the offshore brokerage account because they could not get in touch with the broker. Prior to this date, September 28, 2011, ECIT stock was thinly traded, with no prior trades in the previous three weeks and only ten days of minimal trading over the previous nine months.

26. On or about September 30, 2011, Person No. 1 worked with Person No. 2 to coordinate the issuance of an ECIT press release with the start of the schemers' upcoming selling campaign. On or about the same day, Person No. 1 and Person No. 2 communicated with the broker for Person No. 1's offshore brokerage account about their instructions for selling ECIT stock during the planned stock promotion.

27. To generate public interest in ECIT's largely dormant stock, the schemers devised and organized a promotional campaign using press releases and email blasts touting ECIT stock. The schemers' promotional campaign stretched from approximately October 3, 2011 through February 17, 2012, and broke down into three distinct promotional periods. The first promotional period ran from October 3, 2011 through November 18, 2011. After a short

lull, the second promotional period began on December 3, 2011 and continued until December 20, 2011. The third period ran from January 21, 2012 through February 17, 2012.

28. Throughout the promotional campaign, defendant DINO PAOLUCCI directed ECIT's transfer agent to issue more than a dozen press releases on behalf of ECIT. Defendant PAOLUCCI participated in the preparation of the press releases, most of which were reviewed by Person No. 1, Frank J. Morelli, III, and, starting in October 2011, Louis Buonocore. Defendant PAOLUCCI timed his email blasts to coincide with the issuance of the ECIT press releases, thereby cloaking the email blasts beneath a veil of reliability and legitimacy.

29. Defendant DINO PAOLUCCI's email blasts were sent from penny stock promotional websites that he controlled, such as the Bull Exchange, PennyPlayersClub.com, InsanePennies.com, and Marketbulls.com. These email blasts, which were sent to subscribers of defendant PAOLUCCI's promotional websites, among others, hyped ECIT and its stock and were designed to create a sense of urgency among potential investors. They stated, among other things:

- "Make sure you watch the news on this company [ECIT] in the near future. We've been looking for another huge winner and we think that ECIT has what it takes! So if you're late getting in, it's ok . . . just don't miss the entire party!!!"

- "We ask that you please continue to refer your trader friends, especially once you begin to see ECIT trade above current levels. ECIT should be treated like an IPO on the brink of some key developments and we want our readers to have an opportunity to assess it as an investment before WALL STREET finds out . . . KEEP WATCHING ECIT MOVE FORWARD THIS WEEK, AS WE BELIEVE A HUGE BREAKOUT IS ON THE HORIZON FOR ECIT!!!"

11

- "ECIT is our next WINNER and you do not want to miss out. There is no doubt about it, this stock is headed for the moon. There could be huge opportunities to cash out on big gains as this stock doubles over and over again. We encourage you to sell some off to cover your initial investment . . . but we must make one request: Do not wait too long or you may lose your chance to load up on these shares while they are still selling for pennies on the dollar. 'Our previous recommendation letters have turned $5,000 into $50,000 in less than 1 month!' We believe that ECIT could easily make these gains pale by comparison . . ."

- "Many of our subscribers made a lot of money. Our Inbox was flooded with thanks from those that jumped in early. Congrats and we appreciate hearing from you! We also got quite a few emails from subscribers that wished they had jumped into ECIT when we first mentioned it. Today was the perfect opportunity for those that wanted to get in and buy the dips! Shorts attempted to create a downfall and we are SURE with the RIGHT news, we will experience the MOTHER of all short squeezes. Today was a GREAT BUY opportunity!"

30. The press releases and email blasts issued during the promotional campaign had their intended effect and dramatically increased ECIT's share price and trading volume.

31. At the same time that defendant DINO PAOLUCCI was issuing press releases and email blasts touting ECIT and its stock, the schemers, through Person No. 1 and Person No. 2, were selling their free trading ECIT shares to public investors at inflated prices.

32. None of the schemers' press releases or email blasts, however, disclosed the truth to the investing public, including the following: (i) the schemers had control and/or influence over nearly all of ECIT's stock, (ii) they were responsible for authoring and issuing the press releases and email blasts, and (iii) they were selling their ECIT stock in coordination with the issuance of the blast emails and press releases. The omission of these material facts

concealed the schemers' interest in ECIT and created the false and misleading impression that the promoters truly supported the purchase of ECIT stock as a wise investment. In reality, the sole purpose behind the promotional campaign was to generate interest in ECIT stock so the schemers could dump their shares.

33. Moreover, the email blasts from defendant DINO PAOLUCCI's promotional websites did not disclose to subscribers that defendant PAOLUCCI and the other schemers received all of the proceeds generated from sales of ECIT stock that they controlled.

34. To the contrary, many of the email blasts falsely stated that the promoter and/or its affiliates received only a fixed fee (e.g., $100,000) or "no form of compensation for coverage of ECIT" other than restricted shares.

35. These statements were materially false and misleading. A reasonable investor, before making the decision to purchase ECIT stock, would have wanted to know the true economic benefits the schemers were obtaining from the email blasts and their sales of free trading ECIT stock.

## IV. Buonocore Joins the Group

36. Meanwhile, in or about mid-October 2011, Person No. 1 caused approximately $15,000 to be transferred to the original owners of ECIT as a further payment for the company's shares.

37. During October 2011, defendant DINO PAOLUCCI and Frank J. Morelli, III, grew increasingly dissatisfied with Person No. 1's efforts, as the schemers' nominee, to sell their ECIT stock. By the end of October 2011, the schemers had generated less than $200,000 from the sales, which was insufficient to finish paying off the ECIT acquisition, and had paid

only approximately $15,000 more of the acquisition price. As a result, defendant PAOLUCCI sought assistance from Louis Buonocore, whom he knew from other penny stock deals and promotions. He asked Buonocore to manage the scheme going forward and to keep an eye on Person No. 1, who controlled the brokerage accounts from which the schemers' free trading ECIT stock were sold.

38. In or about late October 2011, Louis Buonocore agreed and joined the scheme to manipulate the stock of ECIT at defendant DINO PAOLUCCI's invitation. In or about early November 2011, Buonocore transferred approximately $100,000 to a bank account controlled by Person No. 1. The schemers used Buonocore's contribution to help pay off the ECIT acquisition price. In addition, defendant PAOLUCCI caused Buonocore to assist with the promotion of ECIT and the sale of its free trading shares during the promotion. The schemers agreed that defendant PAOLUCCI would continue to receive approximately 60% of the ECIT stock sale proceeds, but now Person No. 1, Morelli, and Buonocore would split the remainder of the profits. Again, neither the schemers nor ECIT disclosed their secret, unwritten agreement to the market or the SEC at this point in time or subsequently.

39. On or about November 1, 2011, Person No. 1, Frank J. Morelli, III, and Louis Buonocore participated in a meeting in New York City with several other stock promoters to plan the further promotion and manipulation of ECIT stock.

40. Both before and after this meeting, the schemers retained several additional penny stock promoters to tout ECIT and to participate in pre-arranged purchases of free trading shares to assist the manipulation of ECIT stock. For example, one of these promoters sent an email to Louis Buonocore on or about December 21, 2011 identifying

purchases of ECIT stock that the promoter and his colleagues had arranged on behalf of the schemers.

41. On or about November 3 and 4, 2011, Person No. 1 caused approximately $56,000 to be transferred from Global Media's account at JPMorgan Chase to the original owners of ECIT as further payments for the company's shares, bringing the total payments to approximately $226,000.

42. On or about November 4, 2011, in an effort to complete the merger of ECIT and D&R Technology, defendant DINO PAOLUCCI, Person No. 1, Frank J. Morelli, III, and Louis Buonocore caused the controlling shareholders of ECIT to enter an agreement with D&R Technology to sell their stock for $262,000.

43. In connection with the execution of this agreement, the schemers continued their promotional campaign. For example, on or about November 7, 2011, defendant DINO PAOLUCCI caused ECIT to issue a press release announcing this agreement. In addition, on or about November 6 and 7, 2011, defendant PAOLUCCI caused additional email blasts to be distributed touting ECIT.

44. The promotional activity in the first period continued until on or about November 17, 2011, a date upon which the schemers coordinated the issuance of another ECIT press release with the distribution of another email blast by one of defendant DINO PAOLUCCI's promotional websites.

45. Meanwhile, in or about mid-November 2011, Person No. 1 caused approximately $131,000 to be transferred from the offshore brokerage account that Person No. 1 controlled and from Global Media's account at JPMorgan Chase to the original owners of ECIT

as further payments for the company's shares. Approximately $87,000 of these funds came from Person No. 1's sale of free trading ECIT shares from the offshore brokerage account that he controlled on behalf of the schemers. As of this point in time, the schemers had paid approximately $357,000 of the $485,000 that they owed for both ECIT's restricted and free trading shares.

V.      **The Second Promotional Period**

46.     In or about December 2011, the second promotional period, the schemers resumed their promotional campaign. For instance, on or about December 4 and 5, 2011, the schemers caused approximately 20 email blasts touting ECIT to be widely distributed. The schemers also caused email blasts to be sent out on or about December 8 and 13, 2011. None of the email blasts disclosed that defendant DINO PAOLUCCI and the other schemers effectively controlled most of ECIT's stock, or that the schemers were profiting by coordinating their stock sales with the blast emails.

47.     The schemers coordinated these email blasts with ECIT press releases that they caused to be issued on December 1, 5, 8, and 15, 2011.

48.     As a result of these promotional campaigns, from September 28, 2011 through the end of December 2011, Person No. 1, as the schemers' nominee, caused approximately 951,000 ECIT shares to be sold from Global Media's account at Spencer Edwards. Over the same period, Person No. 1 also caused numerous shares of ECIT to be sold from the offshore brokerage account that he controlled. The schemers used the proceeds to pay for the promotions and to continue paying off the remainder of the ECIT acquisition price, and distributed the rest as proceeds.

49. On or about December 16, 2011, Person No. 1 caused another payment of the ECIT acquisition price to be paid, bringing the total payment to approximately $412,000. Specifically, he caused approximately $55,000 to be transferred from Global Media's account at JPMorgan Chase to the original owners of ECIT as further payments for the company's shares.

## VI. The Third Promotional Period

50. During January and February 2012, defendant DINO PAOLUCCI, acting on behalf of the schemers, conducted a third period of email blasts touting ECIT using his stock promotional websites. These email blasts ran in tandem with (i) additional promotions orchestrated by other individuals and entities hired by the schemers and (ii) additional ECIT press releases that defendant PAOLUCCI caused to be issued.

51. Again, none of the email blasts disclosed that defendant DINO PAOLUCCI and the other schemers effectively controlled most of ECIT's free trading stock, or that they were profiting by coordinating their stock sales with the blast emails. The email blasts also made misrepresentations and material omissions concerning the compensation received by the schemers similar to those described in paragraphs 33 and 34.

52. During January and February 2012, Person No. 1, as the schemers nominee, continued to sell the group's free trading ECIT shares in conjunction with these promotional efforts. The schemers used the proceeds to pay for the promotions and to make the final payments of the ECIT acquisition price, and distributed the rest as proceeds.

53. As the email blasts and other promotions advanced, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Louis Buonocore became increasingly distrustful of their nominee, Person No. 1. In or about January 2012, defendant PAOLUCCI asked Person No. 1 to

17

give Buonocore access to Global Media's Spencer Edwards account. Although defendant PAOLUCCI, Person No. 1, and Buonocore exchanged various emails regarding their progress in getting Buonocore access to the Spencer Edwards account, Person No. 1 and Buonocore did not include defendant PAOLUCCI on their emails with Spencer Edwards, thereby continuing to conceal his role in the scheme.

54. On or about January 19, 2012, Person No. 1 provided verbal authorization to Spencer Edwards for Louis Buonocore to execute trades in Global Media's account at the brokerage firm. As soon as Person No. 1 informed Buonocore about this development, Buonocore notified defendant DINO PAOLUCCI.

55. On or about January 23, 2012, Louis Buonocore emailed Person No. 1 to inform him that the schemers had sold more than 1.5 million shares of ECIT's stock over the prior three days and they needed to "position some more stock." Buonocore also stated that he had "left some gtc's [good 'til cancelled sell orders] for tom[orrow] morn[ing]" and that the schemers' selling represented approximately 27% of the total trading volume that day.

56. On or about the next day, January 24, 2012, Louis Buonocore sent another email to Person No. 1 telling him that the schemers only had 900,000 shares of ECIT stock left in the Spencer Edwards brokerage account.

57. On or about January 30, 2012, Louis Buonocore emailed Person No. 1 and instructed him to fax a written trading authorization to Spencer Edwards so that he could "call in trades and finish off the remaining [ECIT] shares."

58. Meanwhile, on or about January 27, 2012, the schemers caused the controlling shareholders of ECIT and D&R Technology to revise the agreement that they had