UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,.        2:16-cr-00503-ER-1
                         .
          Plaintiff,     .
                         .        U.S. Courthouse
      v.                 .        601 Market Street
                         .        Philadelphia, PA 19106
DINO PAOLUCCI            .
                         .
          Defendant.     .
                         .        September 7, 2018
. . . . . . . . . . . . ..        1:42 p.m.

                   TRANSCRIPT OF DETENTION HEARING
                    BEFORE HONORABLE TIMOTHY RICE
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          PATRICK MURRAY
                             UNITED STATES ATTORNEY'S OFFICE
                             615 CHESTNUT STREET, SUITE 1250
                             PHILADELPHIA, PA 19106
                             215-861-8261
                             Email: patrick.j.murray@usdoj.gov


For Dino Paolucci:           SUSAN M. LIN
                             IRVING COHEN
                             KAIRYS RUDOVSKY MESSING FEINBERG & LIN
                             THE CAST IRON BUILDING
                             718 ARCH ST SUITE 501 SOUTH
                             PHILADELPHIA, PA 19106
                             215-925-4400
                             Fax: 215-915-5365
                             Email: slin@krlawphila.com

AUDIO OPERATOR:              C. WARDLAW

TRANSCRIBED BY:              ASC Services, LLC.
                             1304 Concourse Drive, Suite 120
                             Linthicum Heights, MD. 21090
                             (410) 694-9333

                Proceedings recorded by electronic sound
          recording, transcript produced by transcription service.

```
 1              (Matter begins 2:05 p.m.)
 2              THE COURT:  All right.  Now, we're going to go to Mr.
 3  Paolucci.
 4              MR. MURRAY:  Your Honor ...
 5              THE COURT:  Mr. Murray?
 6              MR. MURRAY:  ... Patrick Murray for the government.
 7              THE COURT:  And you're Mr. Cohen. Correct?
 8              MR. COHEN:  Good afternoon, Your Honor.  Irving Cohen
 9   ...
10              THE COURT:  With your bodyguard, Ms. Lin?
11              MR. COHEN:  Susan Lin of...
12              MS. LIN:  I hold his bags, Your Honor.
13              THE COURT:  All right.  We're here for an
14  arraignment.  Let's start with that.
15              Have you had a chance to review the charges with your
16  client, Mr. Cohen?
17              MR. COHEN:  Yes.  He's received the copy of the
18  indictment, waived its public reading and he enters a plea of
19  not guilty.
20              THE COURT:  All right.  Could you please stand, sir?
21              COURTROOM DEPUTY:  Dino Paolucci, you've been charged
22  in Criminal Indictment 16503, defendant number one.
23  (Indiscernible).  In violations count one, Title 18 USC Section
24  1343, wire fraud, nine counts; count two, title USC 18 USC
25  Section 371, Conspiracy; count three, title USC 15 USC Section
```

1   78j(b), 78f(f); and 17 CER Sections 240.10B-5, securities fraud

2   ;and count four, Title USC Section 2, do you -- aiding and

3   abetting.  How do you plead?  Guilty or not guilty?

4           MR. PAOLUCCI:  Not guilty.

5           COURTROOM DEPUTY:  Thank you.  You may be seated.

6           THE COURT:  You may be seated, sir.

7           You have 14 days to file a motion with Judge Robreno

8   unless you get an extension.  And government's move for

9   detention, correct?

10          MR. MURRAY:  Yes, Your Honor.  The government is

11  seeking detention because the defendant is an extreme risk of

12  flight.

13          THE COURT:  Is there any presumptions in this case?

14          MR. MURRAY:  There is not, Your Honor.

15          THE COURT:  All right.  So, why don't you -- do you

16  want any evidence presented or do you want just have argument?

17          MR. COHEN:  Argument is good enough for us.

18          THE COURT:  Okay.  Go ahead, Mr. Murray.

19          MR. MURRAY:  Thank you, Your Honor.

20          THE COURT:  You can have a seat, Mr. Cohen.

21          MR. COHEN:  Thank you.

22          MR. MURRAY:  We believe that there's no condition or

23  combination of conditions that can reasonably assure the

24  defendant's presence at the hearings in this case.  We've

25  submitted a sentencing -- I mean, a detention memorandum and I

1   wanted to summarize some of the things that we've pointed out

2   before.

3         First, the defendant is facing a very substantial

4   sentence if convicted.  It is a 108-135 months and that's with

5   respect to the charge conduct.  In addition, the government is

6   continuing this investigation of other securities fraud and

7   manipulations of the defendant.  And what the defendant -- the

8   loss here is approximately $60 million in losses.  The range

9   we're talking about is $25 million to $65 million.  So, he's

10   facing a significant sentence and has an incentive to flee.

11         In addition, the evidence in this case is strong.  It

12   includes witness testimony, it includes voluminous

13   documentation, it will include all types of financial records.

14    It includes text message, emails, as well as phone records.

15         Furthermore, although the defendant doesn't have a

16   criminal history in the United States, he does have one, that's

17   an old one, in Canada.  The defendant does have a history of

18   failing to appear for matters in the United States.

19         In connection with a related case, there was a case

20   filed related to this, related to the same alleged securities

21   fraud manipulation that -- before Judge Robreno -- that was

22   filed in September of 2016 and the defendant was served in

23   Canada, he defaulted.  He never appeared, he never contacted

24   the SEC.  So, there was a default judgment that was entered

25   against him in 2017, I believe it's August of 2017.

1           And as a result of that, there were substantial

2   financial penalties imposed upon him.   There was disgorgement

3   that was imposed of $2,050,000 as well as approximately

4   $300,000 in interest and there was also a separate civil

5   penalty of $2,050,000.   And those were the disgorgement related

6   to the profits that the defendant and his co-schemers obtained

7   as a result of this manipulation.   No payments were made with

8   respect to that and despite the fact that the evidence that we

9   provided through documents and other witnesses is that the

10  defendant obtained substantial proceeds in connection with

11  this.

12          And frankly, Your Honor, the defendant -- the

13  evidence shows and that the defendant has substantial resources

14  and the means to flee in this case.   In connection with the

15  financial statement that we received from probation, it

16  indicated that the defendant has only $2,000 in a TD Bank which

17  was very surprising in light of the fact that there were times

18  million dollar transfers to them, $100,000 transfer to him,

19  those were years ago but the statement that we're receiving is

20  that he only had two million when in, fact, the documentary

21  evidence, as well...

22          THE COURT:   Two thousand or two million?

23          MR. MURRAY:   Sorry.   Did I say -- $2,000 is what we

24  have heard.   Thank you.   There were -- where the document

25  evidence shows that nominee accounts of the defendant, there

1    were large sums in connection with just one manipulation and

2    the evidence shows that he was involved in other ones as well.

3              In addition, Your Honor, the evidence shows that this

4    defendant was working through nominees.  That these individuals

5    were receiving funds for him.  He also had nominees and co-

6    conspirators who had nominee accounts where trading was

7    conducted that the defendant was monitoring to make sure that

8    they were doing the appropriate trading.  Those accounts were

9    in offshore locations like Belize and Switzerland and the

10   defendant, as a result, has used nominees in the past and has a

11   knowledge of the international financial markets.  And so, we

12   believe he has the means to flee.

13             In addition, as we've pointed out in our paperwork,

14   the defendant has used an alias in the past and it's something

15   that he'll have an opportunity to do again.

16             Furthermore, Your Honor, the defendant has taken

17   efforts to avoid the jurisdiction of this court and the United

18   States.  The defendant, the records indicate and testimony

19   would show, used to travel to the United States.  But as of

20   early 2013, after a trip in approximately April 2013, the

21   records indicate that the travel stopped.  And in fact, we have

22   the defendant's passport that indicates that there's no recent

23   travel to the United States since approximately 2017.  And

24   that's corroborated by the statements of witnesses that the

25   defendant stopped coming to the United States and required

1   various co-conspirators to come to his home city of Toronto for

2   meetings and also had meetings in other foreign jurisdictions

3   like Cancun or the Dominican Republic.

4          And furthermore, Your Honor, even just recently, and

5   I'm sure Mr. Cohen's going to talk about this incident, but

6   there's an incident that's very telling with respect to the

7   defendant that when he was taking a recent flight down to

8   Mexico, the Mexican authorities had, as I understand it, knew

9   about the arrest warrant that were pending in this case and

10  arrested him or detained him.

11         And then he was being put on a flight back to Mexico.

12   The defendant when...

13         THE COURT:  To Mexico?

14         MR. MURRAY:  Sorry, back to Canada, Your Honor.  He

15  was in Mexico, a flight back to Canada.  When the defendant

16  learned the next morning that that flight was going to stop in

17  the United States, he refused to get on the plane.

18         I understand that there was an altercation with the

19  Mexican authorities and that as a result, he got on a

20  subsequent flight.  But when he heard that there was going to

21  be flight to the United States, he refused to get on the

22  flight.

23         Furthermore, Your Honor...

24         THE COURT:  So, he was arrested by the Mexican

25  police?

1              MR. MURRAY:  I don't know if it was arrest or a

2    detention but he was -- the Mexican authorities, when he...

3              THE COURT:  What do you mean an altercation?

4              MR. MURRAY:  My understanding and I don't know the

5    details of it, Your Honor, that the defendant refused to get

6    on; that there was some type of physical thing.  I know and

7    I've seen a picture but the defendant was bruised in connection

8    with that.

9              I don't know the details of it, that was certainly --

10   nothing that the U.S. government ever requested or approved of

11   or authorized but I have heard that his had occurred.  So, I

12   understand, Mr. Cohen has concerns about that and I understand

13   that's going to be litigated before Judge Robreno.  He's

14   indicated that he wants to raise that as he has the right.  But

15   I think the fact shows that this defendant, when he heard he

16   was coming to the United States, refused to get on the flight.

17    We have no idea what measures were taken to get the defendant

18   on the flight whether it was just convinced (phonetic) or it

19   was physical but we understand that happened and I think that

20   shows that this defendant, in addition to all the testimony in

21   his travel history didn't want to come.

22             And as The Court knows, the defendant has no ties to

23   this jurisdiction.  He has no family here.  He has no job here.

24    He doesn't have any assets here.  And as a result, he has no

25   reason to stay here and a significant reason to flee.

1          And as a result, we don't believe that there is any
2    combination of conditions that secure his appearance and
3    believe that he is an extreme flight risk and are asking for
4    his detention.
5          THE COURT:  All right.  Very well.  Mr. Cohen?
6          MR. COHEN:  Thank you, Your Honor.
7          Let me just comment on a few things that I just heard
8    and then I'll go in to my presentation.
9          THE COURT:  Okay.
10          MR. COHEN:  What Mr. Murray just said means that any
11   foreign national who gets arrested in the -- in a case in the
12   United States District Courts of whatever is not entitled to
13   bail because they have no ties to the community, they have no
14   ties to the states.  And we know that that's not the case.
15          Every case has to be looked at individually.  So,
16   let's look at this individually.  Mr. Paolucci's personal
17   history as he was born in Canada in 1977.  His father and his
18   mother are Canadian citizens.  He went to college for several
19   years.  He has a sibling, an older brother.  After he left
20   college, he operated a gym and then started to work for the
21   company that is -- that was a public company that is controlled
22   generally, although it's a public company, by his father.
23          While he was young and continuing, he attends church
24   regularly at St. Mary Star of the Sea.  He was an altar boy.
25   He was confirmed.

1          For the last five years, Your Honor, he's been living

2     with a woman who's here in court, who came down from Canada,

3     Your Honor, and she is in court.  Caitlin Morris (phonetic) --

4     they lived -- have lived together for...

5          THE COURT:  Thanks for coming, ma'am.

6          MR. COHEN:  Excuse me?

7          THE COURT:  No, I said thank you for coming.

8          MR. COHEN:  As far as criminal history is concerned,

9     he got into a fight as a teenager when he was about 18 years

10    old.  That case was resolved.

11         And then I think the only other matter was marijuana

12    possession in Canada but I -- but that's an interesting

13    situation when he was about 22 or 23 years old and that's going

14    to relate to what I'm going to talk about as to why he did not

15    come to the United States over the last four or five years

16    because he really wasn't allowed to come to the United States.

17         Now, this investigation started over four years ago

18    and I'm going to talk about but I want to comment on one -- a

19    comment that Mr. Murray made was that the possibility of

20    additional charges involving some other matters which we don't

21    know anything about but we're talking about investigation by

22    the SEC that started over four years ago.  I should know

23    because I attended a meeting at the U.S. attorney's office four

24    years ago in which the potential charges in this particular

25    case were discussed.

1           So, I would imagine that after four years of

2    investigation, if there were going to be any other charges,

3    they would have been filed by this time.  So -- but right now,

4    there are no other charges.  So, we're only dealing with this

5    particular -- these particular charges.

6           After that meeting, Your Honor, which I had with

7    several existing United States Attorneys in this district, I

8    indicate that if there was going to be a prosecution and we

9    didn't know it -- we didn't know at that time, he would

10   surrender himself.  We would bring him in and he would

11   surrender himself.

12          We heard nothing.  I didn't even hear anything that

13   there was an SEC complaint that was brought, apparently, about

14   two years later.

15          THE COURT:  This is the $4 million thing?

16          MR. COHEN:  That's the SEC complaint.  Yes.  A civil

17   complaint filed by the SEC.

18          The only -- what we found out, only when he was taken

19   at the custody, if you want to call it that, in Mexico was that

20   an indictment had been filed almost two years ago in this

21   district.  No arrest was made in Canada.  This indictment was

22   returned, I think, in November or December of 2016, almost two

23   years ago.  No attempt was made to arrest him or notify me, as

24   counsel, or if they didn't want to notify me, to have him

25   arrested in Canada and go through the normal extradition

1  process.  They wouldn't have had to because we would await

2  extradition and he would have surrendered himself as we told

3  the government at that time.

4          Instead, they engaged in a process which is called

5  rendition.  The Mexican authorities, took him into custody

6  without -- not arresting him, took him, detained him,

7  essentially kidnapped him and held him for 10, 12 hours,

8  besides the fact that they later assaulted him and he was held

9  by Mexican authorities, put on a plane that the United States

10 government knew because they were involved at the time, was

11 going to -- not go through directly to Toronto but was going to

12 stop in Houston.

13         Now, we know what the reason for that was, so that

14 the United States could take him into custody.  He went on --

15 he was taken physically, bodily, against his will that's called

16 rendition, Your Honor.  And it's not just rendition from

17 another country, it's a rendition from a Canadian citizen who's

18 walked in to (phonetic) the United States and then taken in --

19 taken into custody by another foreign agent.  This is -- I'm

20 going to talk about this little layer from the legal aspects of

21 that.

22         But the bottom line is had we heard of this

23 indictment, Mr. Paolucci would have been here on his own.  Now,

24 as far as a bond is concerned, all right, we expect that if

25 Your Honor is willing to set a bond which we think you should

1   do, that it would involve a substantial amount -- I can't give

2   you the number but it could be in the millions of dollars

3   because -- and the family is prepared to put up the whatever

4   assets they have, his parents, his brother, his wife -- I'll

5   call her his wife -- even the wife's parents are prepared to

6   put up and sign a bond in order to guarantee his presence.

7   Why?  Because they know that he will return to court.

8           The family controls a public company which employs

9   over 200 (phonetic) people.  And the client, my client is one

10  of those employees and has been so employed by them for 15

11  years.  The family shares in that corporation is worth

12  approximately $3 million.  Some of the shares are restricted.

13  But the shares are worth $3 million.

14          In addition, my client's parents have additional

15  assets in term -- in excess of about $3.5 million with other

16  property that they own.  In addition, the size of property that

17  would be the subject of proceedings that my client would

18  violate any of the terms or conditions of his pretrial release,

19  approximately $250,000 is presently available as a cash

20  deposit.  So, we're talking about quite a bit of money and it

21  involves the -- all of the assets that the family has

22  accumulated and this is a family that's very tight, very close.

23          There's no way that Mr. Paolucci is going to risk, in

24  any way, his family losing everything that they worked for

25  their entire lives because there's no chance that he would

1    violate any of the terms.  His parents have been married for 45

2    years.  His mother is a retired secretary and she and her

3    husband jointly own their own home worth in the neighborhood of

4    a million and a half dollars, which would also be subject to be

5    forfeited.

6            There's no chance that Mr. Paolucci would leave them

7    with nothing.  Now Ms. Morris who's here, Your Honor.  Kate

8    Morris (phonetic) is 34 years old and she's also prepared to

9    sign up on.  They lived together for the last four years at 21B

10   Maple Avenue N, Mississauga, Canada and it's owned by Mr.

11   Paolucci's mother. They pay rent.  She's a licensed teacher.

12   She has a BA plus she teach at an advanced teacher certificate

13   from the Ontario College of Teachers and she teaches special ed

14   students.  She earns approximately $67,000 a year and, as I

15   said, her parents, David and Patricia, also in the townhouse,

16   worth about 600,000 and they're willing to sign the bond.

17           So, we're talking about substantial assets that would

18   wipe out -- wipe -- that would be wiped out completely if he

19   were not to -- if he would violate any of the terms.

20           Now what conditions do we suggest that would make

21   your Honor (phonetic) comfortable?  Well, we're suggesting,

22   Your Honor, because he is a Canadian citizen that he be allowed

23   to stay in the United States -- excuse me, that he would be

24   willing to stay in the United States and not return to Canada

25   until and unless this case -- when this case is over.

1    We are suggesting, Your Honor, that for families

2  benefit, his benefit, his wife's benefit that that would be

3  United States District Court of Buffalo, New York, which is the

4  closest big city that has a federal court to Toronto.  It's

5  approximate half hour or 40 minutes away.  So, that would allow

6  his wife to continue working.  It would allow his family to

7  visit him over a short way across I think the St. Lawrence, I

8  think that's what it is, and he would be on a pretrial

9  supervision.  And if Your Honor felt that was necessary, he

10  could also be electronically monitored with a bracelet.  While

11  there is no risk, no risk of my client failing to report or to

12  return to court.  Even in a totally completely unlikely event

13  that happens, the U.S. and Canada had extradition treaty.

14    So, not only would the family lose everything, lose

15  all these assets that I just told you about, Mr. Paolucci would

16  be arrested in Canada anyway and then returned to the United

17  States, which, of course, is what should have happened in the

18  first place in this case.

19    Now, this brings me to what occurred here.  Despite

20  an indictment being filed almost two years ago, no steps were

21  taken to have Mr. Paolucci arrested in Canada and extradited to

22  the United States.  Now, I've looked at that extradition

23  treaty.  There's no restriction on him being extradited in

24  United States.  In fact, statistics show that 90 percent of

25  those requesting states of Canada were granted extradition.

1            THE COURT:  Even of Canadian citizens?

2            MR. COHEN:  Yes.  That's exactly what it is.  Yes.

3    That's the point I'm trying to make.  A Canadian citizen who's

4    asked to be extradited to the United States, I believe the

5    statistics, I may be a little off, approximately 90 percent.

6            Thirty-four years ago might have been a different

7    story that my research has indicated.  But even so, the

8    official procedures of the treaty training were not availed by

9    the United States and we don't know why.  I've asked the

10   government and they said they didn't avail themselves of this

11   treaty.

12           But the manner in which Mr. Paolucci was detained and

13   the rendition that occurred raises significant legal issues as

14   the propriety of this prosecution itself.  Mr. Paolucci and Ms.

15   Morris (phonetic) flew to Cancun for a vacation.  It was the

16   fourth time they've gone.  They only go to Cancun to celebrate

17   his birthday and this was the fourth time they have done that.

18   Nothing happened on any of the other occasions.  They were

19   stopped and deported by Mexican authority.  That's about 10

20   hours being told he could not enter Mexico and has to return to

21   Canada.  Mr. Paolucci was told instead that he was being put on

22   a plane that stop ion Houston where he was arrested pursuant to

23   the warrant on this indictment.

24           It is clear that the authorities in the United States

25   were instrumental in having the Mexican authorities take Mr.

1    Paolucci against his will and forcibly put him on a plane in
2    custody of two Mexican police.  Moreover, that physical
3    rendition included the severe beating of Mr. Paolucci.  Indeed,
4    when first presented to the magistrate judge in Houston, she
5    saw the injuries and asked, "What happened to you?  How did
6    that happen?"  These were visible injuries to his eye, to his
7    shoulder.  By the way, he had surgery on his shoulder and he
8    thinks that that now -- that surgery has now been compromised
9    significantly.

10            As indicated, the rendition of my client, a Canadian
11   citizen, by Mexican police to a third nation, the United States
12   raises significant issues.  These include violations of the
13   United Nation's Charter, the law of nations, and violations of
14   due process under our Constitution as reflected in Case Law.

15            The point of this, of course, that this type of
16   rendition where a person is essentially abducted may result in
17   a problem with the validity of this prosecution.  Now, for
18   instance, Mexico could have arrested him on the warrant and
19   engaged in the proper procedures under the treaty.  But that's
20   not what the authorities in the United States obviously had in
21   mind.

22            One case from the D.C. Circuit noted that such
23   renditions are usually reserved for terrorists and drug
24   traffickers.  One judge in the Southern District of New York
25   actually dismissed an indictment when rendition occurred under

1    these circumstances.  In short, there is concern as to why the

2    normal official course of arrest in Canada extradition was not

3    taken.

4            In fact, in one case citing Article 8 of the treaty,

5    involved Canada suing the United States for allowing the

6    defendant to be kidnapped, that was the word they used, opining

7    that the failure to return the defendant to Canada go to the

8    proper extradition proceedings may be a Fourth Amendment and

9    due process violation.  In fact, there was one case in which

10   these bonds people went to Florida and took somebody into

11   custody and brought him back to Canada.  They were prosecuted

12   for that type of rendition, for kidnapping that person and

13   taking him to Canada.

14           Now, the government talks about that there was a

15   civil case that was resolved -- that was brought a couple of

16   years ago and resolved.  There are issues with respect to that,

17   Your Honor, because -- and I'm not going to into all of the

18   details. But the person named on that civil complaint is not

19   Mr. Paolucci.  It's really his father's name that's on there.

20   The name on that complaint is -- I'll pronounce it correctly

21   Bernardo Paolucci.  His name is Dino Paolucci.  Dino, and your

22   middle name?

23           MR. PAOLUCCI:  Ricardo.

24           MR. COHEN:  Ricardo Paolucci.  So, when the papers

25   were brought to him, he said, "I'm not that person named on

1   this.  I'm not taking them.  They left them there."  And based

2   upon the fact that they left them there, they went ahead and

3   got a default judgment against him.

4           THE COURT:  Whose name is the default judgment in?

5   Bernardo?

6           MR. COHEN:  Bernardo, in his father's name, Your

7   Honor.  That's correct.  Now, so, there are significant issues

8   with respect to that.

9           (Off Microphone)

10          MR. COHEN:  Yes.  Sure.  I got that done.  Now, I

11  want to make it certain of the comments, Your Honor, with

12  respect to what the government said and the specific address

13  (phonetic) to what I said to you before about this marijuana

14  arrest.  He had a small marijuana arrest in Canada in 2003,

15  okay?  That's 15 years ago.

16          When he attempted to go with his family about six,

17  seven or eight years ago, something like that and not with Ms.

18  Morris (phonetic) because he wasn't with her at that time, to

19  go to Disneyland, that was with his parents and his brother,

20  they were going down there, he got stopped trying to come into

21  the United States across the border saying, "You can't come

22  into the United States" apparently referring to this marijuana

23  arrest that he had in Canada which had been fully resolved.

24          So, since that time, what predates all of these

25  actions in this particular case really, he's not even permitted

 1   to come into the United States.  That explains why it hasn't
 2   been in the United States by the United States in the last five
 3   or six years.  So, instead, they picked a flight.  They go --
 4   instead to come to the United States for a vacation, they
 5   decided on Cancun.  He doesn't even like to fly but at least
 6   it's the shortest trip you can have.
 7         That's the reason why -- to explain why he didn't --
 8   hasn't been in the United States.  He isn't trying to avoid
 9   coming to United States.  He's not allowed in the United States
10   according to what happened.  Now, we know this as well from Ms.
11   Morris (phonetic) who has confirmed to me that when she went
12   with him a couple of years ago, right, they weren't allowed to
13   go.  They weren't allowed.  He said, "I can't go.  I'm not
14   allowed to go."  So, that's when they decided on his birthday
15   every year they're going Cancun or she's kind of surprised him
16   and then they continued to go once a year on his -- around his
17   birthday to Cancun.
18         Nothing happened last year.  Nothing happened the
19   year before.  So, it's not that he didn't want to come to the
20   United States.  It's just that he couldn't.  He wasn't allowed.
21         And as far as this altercation is concerned, Your
22   Honor, he didn't do anything at all.  When he found out that
23   this plane was going to Houston, not going directly to Cancun
24   (phonetic)  when they told him he's going back to Canada, he
25   said, "I don't want to go to Houston.  I want to go directly

1   back to Cancun -- back to Canada.   That's where I want to go."

2   And then the Mexican authorities, these cops, four or five of

3   them, beat him up and we know that as well because Ms. Morris

4   (phonetic) is here to tell you that.   I don't know if

5   (phonetic)she needs to testify.   I'm telling you what she told

6   me and there's every reason to believe that.   They

7   (indiscernible) her away from him around her neck and then she

8   saw what they were doing.   The injuries were so severe that the

9   federal judge -- that the magistrate judge in Houston saw that.

10          I want to return to the bottom of this issue because

11   I think that that's obviously why we're here and I know that

12   there's a lot of other issue.   Clearly, there's a problem with

13   this prosecution because of this rendition that occurred,

14   right?   That's going to be raised later on and would be a shame

15   if he had to stay in and then the case gets dismissed.   Now,

16   I'm not telling you I've done all the research, I don't know

17   what a judge is going to decide at this point but clearly,

18   there are significant issues raised.

19          Let's go to the bond.   He's no threat to threat to

20   flee.   He was prepared to surrender.   His family and

21   significant assets will all be at stake.   They have great

22   persuasion (phonetic) over him.   They're prepared to put up a

23   cash deposit of the amount of money that they have available

24   now.   Maybe they could get more later but they got to sell

25   something probably.

1          And it would be regular reporting to pretrial

2    services.  In the United States, you would not be allowed to

3    leave the United States.  He couldn't leave the United States.

4     I mean think about I, if he's living in an apartment in

5    Buffalo, which will be a rent, right, and he's wearing a

6    bracelet and his name is on every list that when somebody comes

7    to the border, how is it possible that he is even going to try

8    to go back to Canada?

9          And the irony is, even if he does, he's going to be

10   brought back because he has nowhere else to go to the world.

11   This is where his family is.  This is where his life is.  He's

12   not going to anywhere else in the world.

13              THE COURT:  If you were released on the condition you

14   said, would he also waive extradition if he did go to Canada?

15              MR. COHEN:  Absolutely.

16              THE COURT:  Like now?  He would waive it -- that if

17   he were somehow to get to Canada today he would say he'll waive

18   extradition.

19              MR. COHEN:  Of course, we...

20              THE COURT:  Okay.

21              MR. COHEN:  Four years ago, we said he would

22   voluntarily surrender and if there was -- if their complaint

23   was brought and he was extradited he would waive extradition.

24              THE COURT:  Because that process takes quite a while.

25

1          MR. COHEN:  Well, it may take a while.

2          THE COURT:  But if you waive, it won't be.

3          MR. COHEN:  But if it waives, it won't take any time

4    whatsoever.

5          THE COURT:  Okay.

6          MR. MURRAY:  Just on the issue of waiver of

7    extradition, Your Honor.  I understand and I've been informed

8    by colleagues and I believe members of the Office of

9    International Affairs that that is often not effective that

10   that document will not secure the extradition in a speedy

11   fashion.  And it would be a concern for the government for that

12   reason based on the advice that I perceived.

13         MR. COHEN:  Your Honor, if -- I'm not sure if the

14   government is correct.  But assuming they are that it may take

15   longer than you would expect even if he waives extradition,

16   he's going to be in custody in Canada if he just picked up --

17   if he'd ...

18         THE COURT:  Or maybe.

19         MR. COHEN:  There's no question about that.  I mean,

20   I just don't see how it's possible that he could somehow or

21   other, avoid all of conditions that Your Honor has the power to

22   impose, the ones that I suggested and with all the money that's

23   going to be put up as at stake, all of these family's

24   lifesaving, not only his family's but his wife's family and her

25   savings.

1        There is just no way that's going to happen and if it

2   would ever happens, he's going to be taking into custody by

3   Canadian authorities at the behest of the United States which

4   should have been done in the first place here.  It would have

5   been -- should have been done in the normal procedure.  I don't

6   know why they didn't do it, Your Honor.  I told them four years

7   ago, just let me know, we'll bring him in.  No, instead, the

8   Mexican authorities had to pick him up when he happened to be

9   flying to Cancun which is astounding, it's just astounding and

10  it raises all sorts of issues.

11       So, in conclusion, Your Honor, I just don't see how

12  it's possible that they're not a combination of conditions, all

13  of the ones that I suggested, Your Honor, and anything you

14  also, Your Honor, might decide to impose.

15       THE COURT:  Okay.  Thank you.  All right, Mr. Murray,

16  we got half the gross national product of Canada available for

17  bail...

18       MR. MURRAY:  Your Honor ...

19       MR. COHEN:  ... And why didn't -- what happened here

20  in terms of the indictment two years ago?  Why was there non-

21  notice to counsel or arrest made?

22       MR. MURRAY:  Your Honor, with respect to this case,

23  when the counsel made a statement that -- and I wasn't present

24  at the meeting, Ms. Smith was at the meeting.  So, she does not

25  recall counsel making that statement but she doesn't deny it

1    happened.  But what she'd certainly never said is promise

2    counsel that she would notify them and in fact, what I

3    understand was she said, we would like to talk to the

4    defendant.  We would like him to come down and meet with us.

5    And we never heard from the defense counsel again.

6          Throughout that process, we were continuing the

7    investigation of the case and we're going to be making

8    disclosures about that and we were hearing from other people

9    and getting evidence that this defendant was somebody that they

10   were afraid of, had me -- had told people that he wasn't going

11   to come to the United States, had not wanted to be present

12   here, and we understood that we would tip him off.

13          For example, one of the witnesses sent some of his

14   nominees...

15          THE COURT:  So, why didn't you have Mounties pick him

16   up?

17          MR. MURRAY:  Your Honor, we didn't proceed with

18   extradition at that time.

19          THE COURT:  No, I understand.  But I'm asking you

20   why.  Isn't that what usually happen?  You call the Mounties,

21   they pick him up and you start the process?

22          MR. MURRAY:  We needed to file an extradition package

23   and that had not done because there was an investigation that

24   was continuing, Your Honor.

25          THE COURT:  Of who?  Of him?

1          MR. MURRAY:  Him and others.  Yes.

2          THE COURT:  But you indicted him.

3          MR. MURRAY:  You're right, Your Honor.  So, Your

4    Honor, that -- we did not pursue extradition and we were -- it

5    continuing to investigate the case and proceeding with the

6    case.  And I understand there will all be questions about that

7    and they're going to be raised before Judge Robreno.  We think

8    we've checked we thought with the -- we think and we thought we

9    acted appropriately and we've taken that course throughout this

10   case.  We do not think that the defendant will be successful

11   with respect to those issues.  We also plan -- we have been

12   continuing that investigation and there's a plan to bring

13   additional charges against the defendant.

14          But when we talk about the assets that we have heard

15   about, Your Honor, I'm surprised that there are these assets

16   when the defendant here is saying that he only has $2,000 in

17   his bank account.

18          THE COURT:  This is parents and his in-laws

19   apparently.

20          MR. MURRAY:  I understand, Your Honor, but that's the

21   complete contrary from what we've heard the witnesses in this

22   case about the wealth of this defendant.   One witness would

23   describe that they met of defendant and he was driving around

24   in a car that Tony Stark of Iron Man was driving around in one

25   of the movies, I'm not a car person but he was somebody...

1          THE COURT:  I have no idea what that means, I'm

2     sorry.

3          MR. MURRAY:  He is one of the -- a very rich comic

4     book character in one of the movies.  I also don't know about

5     what a car is but we have learned that...

6          THE COURT:  What is this like?  The batmobile or

7     something?

8          (Laughter)

9          MR. MURRAY:  A very fancy car and I couldn't tell you

10    what type because I don't obtain that type of information.

11         THE COURT:  Okay.

12         MR. MURRAY:  But we have heard, Your Honor, and the

13    evidence shows that this was a major player in the securities

14    fraud market that he was a promoter that was controlling these

15    manipulations, Mr. Paolucci, that he was very sophisticated and

16    he was constantly working through other people and he was

17    avoiding the United States.

18         As a result, Your Honor, we were very concerned that

19    any effort to contact Mr. Cohen would immediately tip this

20    defendant off and we wouldn't have an opportunity to secure

21    him.  So, Your Honor, we continue the investigation...

22         THE COURT:  I don't understand that.  I'm still

23    having a hard time wrapping my hand around that because you

24    have law enforcement in Canada that cooperates with the United

25    States.  And if you have just had the Mounties arrest him then

1  called Mr. Cohen to say, the Mounties have your guy, we're

2  going to bring him to the United States, that's my

3  understanding of how this process usually works.  And I'm still

4  confused as to why that didn't happen.

5          MR. MURRAY:  Your Honor, our concerns were if the

6  defendant learned about this matter that he would flee.  And as

7  a result, we were continuing on...

8          THE COURT:  How could he flee if he was in the

9  custody of the Mounties?

10         MR. MURRAY:  Okay.  So, my understanding is that in

11 Canada and that there is -- in most instances, the defendant in

12 this type of case would not be detained.  So, he would be

13 arrested, processed, released and as a result, we would not be

14 able to obtain his arrest.  And as a result, we were continuing

15 our investigation of this case and we could -- because we were

16 concerned that the defendant was at risk of flight.

17         THE COURT:  Okay.

18         MR. COHEN:  Your Honor, just briefly, when I first

19 learned about this, I raised the same issues that Your Honor

20 did and I said to myself, why don't they just call me up, and

21 then I discussed this between my associates and said -- they

22 said, maybe they don't want to tip you off because that maybe -

23 - he wouldn't be around.

24         But why don't -- and then I said, but why don't they

25 just arrest him in Canada and go through the normal extradition

1    process and if they felt that he was going to be a a flight

2    risk and stuff like that, they can impose upon the Canadian

3    authorities to make sure that he was detained but at least

4    process would have started.

5           So, I appreciate what Your Honor has said, I still

6    don't understand it myself, I don't think the government has

7    really explained it well enough.  The bottom line here is that

8    this wasn't done in a normal course of the way it should be

9    done and I somehow know -- I sense that maybe they knew that he

10   was going to Mexico, maybe they saw something from year before

11   and they tipped off the Mexican authorities.  I don't really

12   know that, okay, but it such seemed strange.

13          THE COURT:  Okay.  I got it.  I got it.  So, let me

14   just ask Mr. Murray, so, how did the Mexican police know to

15   stop him?  Did you guys put out a red notice or?

16          MR. MURRAY:  It wasn't a red notice, Your Honor.

17   What I understand is that the arrest warrant entered NCIC and

18   then the Mexicans notified us.  In the middle of August

19   (phonetic) and I don't know much more.  I received a call on a

20   Friday that the Mexicans had seen the notice and notified us

21   that Mr. Paolucci would be arriving.

22          THE COURT: I would assume the Canadian Mounties have

23   seen the notice, too.

24          MR. MURRAY:  I don't know.

25          THE COURT:  It wouldn't -- they have walked down the

1    street and grabbed if there's an arrest warrant in the

2    international NCIS system.

3            MR. MURRAY:  Not necessarily, Your Honor.  I mean, I

4    don't...

5            THE COURT:  How did the Mexicans know but in Canada,

6    they didn't?

7            MR. MURRAY:  I don't know, Your Honor.  I don't have

8    any answer to that question.

9            THE COURT:  It's odd.  All right.  One, well I'm

10   going to release him on bail, we're going to talk about how

11   much.  I think that with the financial security that he's

12   willing to post that we'll eliminate the risk of flight plus if

13   he's placed on monitored house arrest in Buffalo and waives

14   extradition, which I'm going to have him do under oath in this

15   courtroom, I think that guarantees his parents.  I don't think

16   that would pose a flight risk if we did that.

17           MR. MURRAY:  I guess I have deep concerns about

18   Buffalo, Your Honor, as The Court knows with electronic

19   monitoring, the defendants can remove that and they're able to

20   feel.  That is the most convenient place that the defendant

21   would be out to fleeing to Canada.  And then in terms of the

22   bond, I guess the question is what is Your Honor talking about

23   in terms of numbers here, if I'm -- if it's property, my

24   understanding is that any property that would be posted would

25   be extremely difficult for the government to ever recover if

1    that was posted if it were Canadian properties.

2              THE COURT:  You have people in your office who can

3    drop the necessary documents to make sure that that is not a

4    problem.  So, it's going to happen today, Mr. Cohen.

5              So, you're going to have a total of -- you're

6    satisfied with properties, this posted in a manner that you can

7    cease it if he flees, he's not going to be released.  So, you

8    can consult with your forfeiture people.  Ms. Grieb (phonetic)

9    is sitting right behind, head of the forfeiture unit...

10             MR. MURRAY:  I see. I'm sure she'll be my first

11   conversation with respect to this, Your Honor.

12             (Laughter)

13             THE COURT:  She used to help me forfeiture work when

14   I had your job.  So, she'll do it and you'll be able to get

15   your properties.

16             So, let's talk about -- how much money are we talking

17   about here, Mr. Cohen?  You can have a seat...

18             MR. COHEN:  How much money to -- upfront money?

19             THE COURT:  Well, I know you have 250...

20             MR. COHEN:  250,000 upfront.

21             THE COURT:  And how much property or assets...

22             MR. COHEN:  Let me consult with my client.  I think

23   certainly 3 million is doable.  Sorry, the bond can be 3

24   million as far as we're concerned.  We want to be practical

25   about this and realistic.

1             THE COURT:  Right.  So, bond of $3 million secured by

2  $250,000 cash and property to be specified to -- in negotiation

3  with government.

4             MR. COHEN:  We'll get the property documents

5  together, Your Honor.

6             MR. MURRAY:  So, I'm concerned, Your Honor.  I

7  thought we were talking about imposing the $3 million of cash.

8   We're talking about simply posting the $250,000?

9             THE COURT:  $250,000 cash plus property to equal $3

10  million.

11             MR. MURRAY:  Okay.

12             THE COURT:  So, it's going to be abond of $3 million

13  secured by cash and property.  The cash component is going to

14  be $250,000.

15             And I'm not waiving the clerk's requirements.  So,

16  you're going to have to -- Ms. Lin (phonetic) had to work with

17  the clerk's office in with Ms. Grieb (phonetic) and Mr. Murray

18  to make sure that all of this is done in a manner satisfactory

19  to government that they're going to be able to grab the assets

20  if there is in fact a violation.

21             MR. COHEN:  I understand, Your Honor.

22             THE COURT:  I'm going to allow him to live in

23  Buffalo, report to pretrial services as directed.  Electronic

24  monitory address to be determined.  He has the assets to pay

25  for the monitoring and 24-hour home detention except for

1  medical necessities and court appearances or to confer with

2  counsel.

3          MR. COHEN:  Thank you very much.  As you know, my

4  office is in New York.  So, if pretrial approves...

5          THE COURT:  Yes, of course.

6          MR. COHEN:  ... He can come to New York.  Thank you.

7          THE COURT:  Surrender, refrain from a passport U.S.

8  or Canadian.

9          MR. MURRAY:  We already have the defendant's Canadian

10  passport.  I guess I would ask, does the defendant have any

11  other passports?

12          MR. COHEN:  No, Your Honor.

13          THE COURT:  Travels restricted to the Western

14  District of New York, Eastern District of PA and Southern

15  District of New York, for counsel only.  Any firearms?

16          MR. COHEN:  No.

17          THE COURT:  Okay.  He can't possess any firearms.  Is

18  there any people you don't want him to contact, Mr. Murray?

19          MR. MURRAY:  Yes.  There are a number of people for

20  with whom he participated in the security...

21          THE COURT:  Right.  Notify Mr. Cohen who they are and

22  I'll put that restriction in.

23          MR. MURRAY:  Yes.

24          THE COURT:  Your address is going to be to be

25  announced.

1        (Off Microphone)

2        THE COURT:  Any other conditions?

3        MR. MURRAY:  There's just that notation that one of

4   the people on that list is currently in the FDC, Your Honor.

5   Mr. Paolucci and him, they're separated but if they happen to

6   be travelling at the same time, they may see each other.  Mr.

7   Paolucci knows that they should not be talking to each other

8   now.

9        THE COURT:  All right.  That sounds good.  Any other

10  conditions?

11       MR. MURRAY:  No, Your Honor.  Not at this time.  We

12  reserve the right to come back to your court, available court.

13       THE COURT:  Sure.

14       MR. MURRAY:  And we want to also raise, Your Honor,

15  just that I don't know if this is the right time, the defendant

16  has not yet obviously been released and his conditions will

17  need to be met after the parties negotiate.

18       THE COURT:  Well, he's going to remain in custody

19  until the clerk's office requirements and satisfied and until

20  I'm satisfied based on talking to both of you that the

21  properties posted in a way that will obviate the need for an

22  international wrangling to get it.

23       MR. COHEN:  I've been in contact with attorneys in

24  Toronto who will take -- I am confident will take care the

25  paperwork necessary to document the properties in their correct

1    way.

2             THE COURT:  Okay.

3             MR. MURRAY:  Your Honor, I just want to reserve the

4    right to seek a stay of that order.

5             THE COURT:  Of course.

6             MR. MURRAY:  And my office just wants to avail the

7    order.

8             THE COURT:  Of course.  Of course.  You all have

9    plenty of time to do that because it's not going to -- it's

10   going to probably take at least a week to do all this.

11            MR. MURRAY:  That's why I understood that this might

12   not be the appropriate time to seek that stay but I wanted to

13   mention it.

14            THE COURT:  All right.  Let's do -- I'm going to

15   place your client under, Mr. Cohen.  Krystal (phonetic) can you

16   do that?

17            DINO PAOLUCCI, DEFENDANT, SWORN.

18            THE COURT:  Sir, you heard us discuss the whole topic

19   of extradition as a Canadian citizen and you will have a right

20   to have an extradition proceeding done.  If you were in Canada

21   and were arrested and the government was trying to bring you

22   back to face charges here, do you understand that?

23            MR. PAOLUCCI:  I do.

24            THE COURT:  Do you understand that you'll have

25   certain defenses, you'd have certain rights to extradition and

1    that process could take as long as a couple of years.

2            MR. PAOLUCCI: I do.

3            THE COURT:  And quite possibly, a lawyer in Canada

4    might be able to prevent your extradition to the United States,

5    do you understand that?

6            MR. PAOLUCCI:  Yes.

7            THE COURT:  Do you understand that as part of the

8    packaging your counsel is proposing for you to be released on

9    bail is that I would let you reside on the Western District of

10   New York which is Buffalo.  But if you were to flee and get to

11   Canada or any other country that has an extradition treaty with

12   the United States, you're agreeing to voluntarily knowingly

13   waive your rights to have any extradition proceeding?

14           MR. PAOLUCCI:  Yes, Your Honor.

15           THE COURT:  And you're willing to do that?

16           MR. PAOLUCCI:  Yes, Your Honor.

17           THE COURT:  Have you had ample time to discuss with

18   your lawyers, the right of giving up?

19           MR. PAOLUCCI:  Yes, Your Honor.

20           THE COURT:  Do you understand that you don't have to

21   waive this right?

22           MR. PAOLUCCI:  I do, Your Honor.

23           THE COURT:  That's not a condition in this country

24   for getting bail.

25           MR. PAOLUCCI:  I understand.

```
 1                    THE COURT:  You're doing this at your own suggestion.
 2                    MR. PAOLUCCI:  Yes, Your Honor.
 3                    THE COURT:  This is not something I'm imposing at
 4       you.
 5                    MR. PAOLUCCI:  Correct.
 6                    THE COURT:  Okay.
 7                    MR. MURRAY:  Your Honor, may I request the
 8       opportunity to present the form for the -- that the defendant
 9       designed to make sure that that waiver is adequate.
10                    THE COURT:  All right.  That's fine.  Do you
11       understand that the government is going to present you a formal
12       waiver form that you're going to have to execute?
13                    MR. PAOLUCCI:  Yes.
14                    THE COURT:  As of today, you're under oath and you
15       have the advice of two extremely capable and experienced
16       lawyers.  It's my understanding that you're going to give up
17       any right to extradition from any country and you would be
18       summarily subject to transfer to the United States.
19                    MR. PAOLUCCI:  Yes, Your Honor.
20                    THE COURT:  Okay.  Do you have any questions, Mr.
21       Murray?
22                    MR. MURRAY:  No, Your Honor.  I want to note the
23       government's objection to the general order of release but I
24       understand it's going to be drafted out.  But we still believe
25       that the defendant is at risk of flight and I understand that
```

1    The Court is having conditions but we have to add.

2              THE COURT:  I understand.

3              MR. MURRAY:  Yes.

4              THE COURT:  You can go to Judge Robreno.  He's right

5    upstairs on the 12th floor I think.  You can go up there if you

6    want and you can appeal if you want to do.  That's certainly

7    your right.  I'll state the order if you need to but I don't

8    think you needed to state because it's not going to be

9    effective until we impose the property.

10              MR. MURRAY:  I'm just doing it for the record to be

11   clear, Your Honor.

12              THE COURT:  Okay.  All right.  Any questions on the

13   extradition waiver?

14              MR. MURRAY:  No, Your Honor.  We're going to look

15   into getting the appropriate form to make sure that there's no

16   language that's necessary as part of that.

17              THE COURT:  All right.  Mr. Cohen. Do you have any

18   questions for your client?

19              MR. COHEN:  No, Your Honor.

20              THE COURT:  Okay.  Thank you.  All right.  Let me go

21   over with you, Mr. Paolucci, the conditions, all right, to make

22   sure you understand them.  You're going to be posting,

23   primarily through your family and your in-laws, $3 million

24   worth of property.

25              It's going to be secured.  It's been promised to pay

1   $3 million and it's going to be secured by 250,000 worth of

2   cash along with additional assets to cover the 3 million.

3           The report is directed to pretrial services that will

4   be in the Western District of New York, in Buffalo.  You're

5   going to reside in address in the Western District of New York

6   and you're going to be on electronic monitoring 24/7 with

7   bracelet, meaning you're not going to be able to leave the

8   residences except for medical appointments, court appearances

9   or to confer counsel.

10          You're going to surrender any passports you have

11  including the U.S. or Canadian, not re-apply.  For one, your

12  travels are restricted to three districts, Western District of

13  New York which is the Buffalo area, Eastern District of

14  Pennsylvania, which is Philadelphia area, and Southern District

15  of New York which is Manhattan.

16          You can't possess any firearms and have no connection

17  with any co-defendants or witnesses.  Mr. Murray will give Mr.

18  Cohen a list of those individuals and you're going to reside at

19  an address in Western District of New York that's going to be

20  approved by me.

21          And you've also agreed to waive extradition should

22  you flee and be arrested in a foreign country whether it's

23  Canada or elsewhere.  You're agreeing that there's going to be

24  no extradition procedure and you can be summarily returned in

25  the United States without any legal protection of international

1    law.  Do you understand that?

2                MR. PAOLUCCI:  I do, Your Honor.

3                THE COURT:  All right.  Do you give me your word that

4    you'll abide by these conditions?

5                MR. PAOLUCCI:  Yes, Your Honor.

6                THE COURT:  Do you understand if you fail to abide

7    with these conditions, you're in violation to your bail, a

8    couple of things are going to happen.  You're going to lose all

9    assets that were posted at the security bail, that's $3 million

10   that's going to be ceased by the United States and Ms. Grieb

11   (phonetic) who's sitting behind Mr. Murray is the chief of the

12   forfeiture unit and she's extremely proficient at that.

13               You're going to -- bail is going to be revoked to be

14   arrested and you're committing a new offense subject to

15   additional 10 years of imprisonment, do you understand that?

16               MR. PAOLUCCI:  I do.

17               THE COURT:  All right.  Do you give me your word that

18   you'll abide by these conditions?

19               MR. PAOLUCCI:  Yes, Your Honor.

20               THE COURT:  All right.  Subject to that, well, you're

21   release subject to the government appealing.  Anything further?

22               MR. MURRAY:  Nothing, Your Honor.

23               THE COURT:  Okay.

24               UNKNOWN:  (Off Microphone).

25               THE COURT:  Yes.  Sure.  We're going to have to sign

```
1    this form.

2              (Simultaneous Speaking)

3              THE COURT:  Okay.  Thank you very much everybody

4              MR. MURRAY:  Thank you, Your Honor.

5              (Matter ends 2:56 p.m.)

6

7
```

1

## <u>C E R T I F I C A T I O N</u>

We, ASC Services LLC, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

_____

_____

DATE:  August 31, 2018