# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16-503 |
| v. | : | DATE FILED: _____ |
| DINO PAOLUCCI | : | VIOLATIONS: |
| | | 18 U.S.C. § 1343 (wire fraud - 20 counts) |
| | : | 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. |
| | | § 240.10b-5 (securities fraud - 6 counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | | Notice of forfeiture |
| | : | |

## SUPERSEDING INDICTMENT

### COUNTS ONE THROUGH TWENTY
(Wire fraud)

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At various times material to this indictment:

1.      Defendant DINO PAOLUCCI, a Canadian citizen residing in Mississauga, Ontario, Canada, was a stock promoter.  He sometimes used the alias Kevin Hood.  Defendant PAOLUCCI promoted penny stock companies.  In addition, defendant PAOLUCCI was closely associated with a public company named D Mecatronics, Inc. ("D Mecatronics"), its wholly-owned subsidiary D&R Technology, Inc. ("D&R Technology"), and Ecoland International, Inc. ("ECIT"), a publicly-traded Nevada corporation that merged with D&R Technology in 2012. PAOLUCCI continued his close association with these entities after ECIT changed its name to Novus Robotics, Inc. ("NRBT") in or about 2012.

1

2.      Frank J. Morelli, III, charged elsewhere, was a business consultant and stock promoter who operated through several businesses and entities.  In or about February 2010, the U.S. Securities and Exchange Commission (the "SEC") filed a civil enforcement action against Morelli and others in connection with the illegal issuance and public sale of the shares of Greenstone Holdings, Inc.  In or about June 2011, pursuant to Morelli's consent, the court entered a final judgment against him in that action that, among other things, barred Morelli from participating in an offering of a penny stock.  The order defined a penny stock as an equity security that has a price of less than five dollars.

3.      Daniel Starczewski, charged elsewhere, was an accountant, and was Frank J. Morelli, III's business partner until approximately mid-2011.

4.      Louis Buonocore, charged elsewhere, was a business consultant and stock promoter who operated through an entity named Bay State Financial Services Corp. ("Bay State Financial"), a Massachusetts-based investor relations firm.  Buonocore's wife was also associated with Bay State Financial.

5.      Carl Marciniak, charged elsewhere, was a stock investor and promoter who operated through various nominee entities and individuals.

6.      Jeffrey Weinfurter, charged elsewhere, was a stock investor and promoter who operated through various nominee entities and individuals.

7.      Danny Colon, charged elsewhere, was a stock investor and promoter.

8.      Person Number 1 ("Person No. 1"), known to the Grand Jury, was a businessman who participated in the promotion of certain penny stocks, often operating through

2

entities that he owned and controlled, such as Global Media Fund International, Inc. ("Global Media"), Sono Associates, LLC, and Crimson Marketing.

9.     Person Number 2 ("Person No. 2"), known to the Grand Jury, was a businessman based on Long Island, New York.

10.     Person Number 3 ("Person No. 3"), known to the Grand Jury, was a businesswoman based in North Carolina and Panama.  She was associated with Mesa Marketing Consultants, LLC ("Mesa Marketing") and JTV Management & Consulting, LLC ("JTV Management"), and assisted defendant DINO PAOLUCCI in his stock promotion business.

11.     Person Number 4 ("Person No. 4"), known to the Grand Jury, was a girlfriend of defendant DINO PAOLUCCI.

12.     Person Number 5 ("Person No. 5"), known to the Grand Jury, was defendant DINO PAOLUCCI's father.  Person No. 5 had a substantial ownership interest in D Mecatronics, D&R Technology, ECIT, and NRBT.

13.     Person Number 6 ("Person No. 6"), known to the Grand Jury, was defendant DINO PAOLUCCI's brother.  Person No. 6 assisted defendant PAOLUCCI with stock promotions and was associated with BMJ Marketing Inc. and Brainstorm Consulting.  Defendant PAOLUCCI frequently used BMJ Marketing and Brainstorm Consulting as nominees.

14.     Person Number 7 ("Person No. 7"), known to the Grand Jury, owned and/or was associated with D Mecatronics, D&R Technology, ECIT, and NRBT.

15.     Person Number 8 ("Person No. 8"), known to the Grand Jury, was a businessman who acted at various times as the chief executive officer ("CEO"), director, board member, and president of various companies.

16.     Person Number 9 ("Person No. 9"), known to the Grand Jury, was a businessman who acted at various times as the CEO, director, board member, and president of various companies.

17.     Person Number 10 ("Person No. 10"), known to the Grand Jury, was a nominee for defendant DINO PAOLUCCI.

18.     The Fight Zone, Inc. ("TFZI") was a Colorado corporation that merged in 2009 with Gold Recycle Company, LLC, a private limited liability company.  TFZI purported to be a gold recycling business.

19.     Earthworks Entertainment, Inc. ("EWKS") was a Delaware corporation that purported to be an entertainment company with interests in instructional videos, children's entertainment, and oldies radio.

20.     Kalahari Greentech, Inc. ("KHGT") was a Nevada corporation, which purported to manufacture solar energy products.

21.     Ecoland International, Inc. ("ECIT") was a Nevada corporation that changed its named to Novus Robotics, Inc. ("NRBT") in or about March 2012.  The corporation's principal place of business was Sandton, South Africa, until February 2012, after which it changed ownership and relocated to Mississauga, Ontario.  According to ECIT's public filings, in 2011 and early 2012, it marketed and sold cave bat guano.  In February 2012, the corporation completed the acquisition of the shares of D&R Technology and, according to its public filings, transitioned into engineering, designing, and manufacturing robotics and automation technology solutions.  The stock of ECIT/NRBT was registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$l$(g).

4

22.     AGR Tools Inc. ("AGRT") was a Nevada corporation that merged with AGR Energy Holdings Inc. in May 2012.  According to public filings, AGRT was in the oil and gas business.

23.     LiveWire Ergogenics, Inc. ("LVVV") was a Nevada corporation. According to its public documents, LVVV developed, marketed, sold, and distributed consumable energy chews.

24.     YaFarm Technologies ("YFRM") was a Delaware corporation, based in Cancun, Mexico, that described itself as an operator of medical facilities and provider of stem cell therapies.

25.     Resource Ventures, Inc. ("REVI") was a Nevada corporation that described itself as an "electrical power production and petroleum exploration company."

26.     Medical Cannabis Payment Solutions ("REFG") was a Nevada corporation that described itself as a company that was in the business of mobile applications built for the medical marijuana industry.

27.     The securities of these companies were publicly quoted on the OTC Bulletin Board ("OTCBB") and/or OTC Markets platforms, including two of its markets: OTXQB and OTC Pink (formerly referred to as the "Pink Sheets"), or their predecessors.  The companies quoted on the OTCBB and these OTC Markets platforms tend to be extremely small, and the stock in those companies tends to be closely held (that is, owned by a small number of individuals) and thinly traded (that is, traded far less frequently than stocks in larger companies on larger exchanges).

28.     The SEC was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities quoted on the OTCBB and OTC Markets platforms.

29.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false or misleading statements and/or the failure to disclose material information to the SEC and the public.  Federal securities laws and regulations also prohibit the manipulation of stock through, among other things, sales made at times and artificially inflated prices set by those trading the stock rather than by market forces.

30.     From in or about at least early 2009 through in or about at least mid-2015, in the Eastern District of Pennsylvania, and elsewhere, defendant

## DINO PAOLUCCI

devised and intended to devise, and aided and abetted, a scheme to defraud shareholders of various public companies, including but not limited to TFZI, EWKS, KHGT, ECIT/NRBT, AGRT, LVVV, YFRM, REVI, and REFG, and to obtain money and property, by means of knowingly false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that at various times:

31.     Defendant DINO PAOLUCCI promoted penny stocks knowing that the stocks being promoted were being manipulated by himself or others to inflate the volume of trading in and the price of those stocks, and took actions to hinder the SEC from detecting the manipulations or taking regulatory enforcement action against those manipulating the stocks.   In

6

order to accomplish this scheme, often referred to as a "pump and dump," defendant PAOLUCCI

took and caused others to take various actions, including the following:

a.    Working with others who had gained control of the vast majority

of restricted shares (which cannot be freely traded in the market) and free trading shares (which

can be freely traded) of companies that traded on the over-the-counter ("OTC") markets.

Defendant PAOLUCCI worked with these individuals to control the timing, volume, and price of

stock available for trading so that the free trading shares could be sold at inflated prices when the

schemers promoted the stock.   Control of the stock by the schemers during the promotion also

made it more likely that the schemers would receive maximum profits from the scheme because

most purchases of the stock by the investing public would be of stock controlled by participants

in the scheme at inflated prices.

b.    Concealing from regulators and the investing public that the

schemers owned or controlled the vast majority of the stock through the use of nominee

corporations and individuals.

c.    Using offshore brokerage firms and foreign corporations for some

of their transactions to further prevent regulators and the investing public from learning of their

manipulation of the stocks.

d.    Using nominees and intermediaries to prevent regulators and law

enforcement from learning who was engaging in and profiting from the stock manipulations by

having the nominees and intermediaries deal with vendors, receive proceeds from manipulations,

and distribute the proceeds of manipulations to other nominees and intermediaries.   At various

times, these nominees and intermediaries included, but were not limited to, Louis Buonocore,

Frank J. Morelli, III, Person No. 1, Person No. 2, Person No. 3, Person No. 4 (defendant

PAOLUCCI's girlfriend), Person No. 6 (defendant PAOLUCCI's brother), Person No. 10, and a

landscaping company located in Mississauga, Canada, as well as other associated individuals and

entities.

e.     At various times, using the false identity of Kevin Hood to disguise

defendant PAOLUCCI's own participation in stock deals.

f.     Obtaining lists of shareholders of the companies that the schemers

planned to manipulate so that defendant PAOLUCCI could confirm which shares were under the

control of the schemers, and obtaining access to fellow schemers' brokerage accounts to ensure

that schemers were continuing to work to coordinate their trading in the securities to artificially

inflate the price of the securities and, ultimately, to obtain higher proceeds from their stock

manipulation.

g.     Coordinating press releases with stock promotions and stock sales.

Press releases are issued by the company whose stock is being sold.  Stock promotions involve

marketing the stock by various means, such as widespread email distributions ("email blasts"),

tweets, radio advertisements, and computer message board posts.  By coordinating press releases

with promotions and stock sales, stock manipulators are able to increase the price and volume of

stock sales by creating the false appearance to investors that there is market interest in the stock

being manipulated when, in fact, there was little or no interest in the stock.  In addition, stock

manipulators also use press releases issued by the company being manipulated as a justification

to regulators for the significant rise in the price and trading volume of the stock.

8

       h.      Causing press releases to be issued that were misleading or that failed to disclose material facts, including but not limited to the fact that the press releases were issued for the purpose of assisting the schemers' plan to manipulate the stock, and that defendant PAOLUCCI was working with others to disguise their control of (1) the timing and content of the press releases and (2) the price and volume of stock sales.

       i.      Causing the national distribution of email blasts and radio advertisements through various businesses names, including but not limited to the Bull Exchange, Market Bulls, Best Penny Newsletter, Gain the Green, Insane Pennies, OTC Market Alerts, and Penny Players Club, to further increase market interest in the stock being manipulated when there was little to no interest in the stock. These email blasts and radio advertisements failed to disclose material facts, including but not limited to the true nature of defendant PAOLUCCI's compensation, defendant PAOLUCCI's control and coordination with others of the press releases, promotions, and trading in the stocks being promoted, and the use of nominees in an effort to prevent the regulators and/or the investing public from learning the identities and roles of the schemers.

       j.      Engaging in manipulative and deceptive securities transactions, including pre-arranged sales and purchases of stock between and among themselves or other individuals under their control, referred to as "coordinated trading," in order to create the false appearance of an active and liquid market in the stock being traded and to artificially drive up the share price and/or trading volume.

       k.      Selling the stock being manipulated, often in a coordinated manner, during and after the promotions in order to maximize profits.

l.      Using offshore accounts as well as domestic and offshore nominees and entities in order to prevent the SEC from being able to determine the identity of persons receiving the proceeds of the manipulations, and also from being able to file actions against the schemers to obtain injunctive relief, civil monetary penalties, and other relief.

m.      Making false statements to the SEC in order to prevent the SEC from halting trading in stocks, which would impair the ability of schemers to profit by selling unsold shares of previously manipulated stock during subsequent promotions.

n.      Using the wires and facilities of interstate and foreign commerce in furtherance of the scheme.

### Manipulations in 2009 and 2010

32.      During 2009 and 2010, defendant DINO PAOLUCCI manipulated multiple stocks by: (a) working together with others who controlled the majority of restricted and free trading shares of public companies; (b) coordinating the companies' press releases with promotions in order to create the false appearance of interest in the companies; (c) working with others to coordinate the selling of stock with the promotions; and (d) using nominees and entities to conceal from the investing public and the SEC the identities of individuals who participated in and profited from the promotions.

### The Fight Zone (TFZI)

33.      In 2009, Frank J. Morelli, III, and his then partner Daniel Starczewski, together with others working with them, gained control of the vast majority of the stock of several public corporations, including the Fight Zone (ticker symbol TFZI) and Earthworks

Entertainment (ticker symbol EWKS). They worked closely with Person No. 8, who was the co-CEO of TFZI and CEO of EWKS.

34.     From in or about February 2009 through in or about May 2009, during several recorded conversations, Frank J. Morelli, III, told a cooperating individual, from whom he was attempting to elicit interest in future stock manipulations, that Morelli was working together with defendant DINO PAOLUCCI and Louis Buonocore on several stock promotions, including TFZI.

35.     On or about February 24, 2009, Louis Buonocore sent defendant DINO PAOLUCCI an email regarding multiple upcoming deals involving Frank J. Morelli, III, as part of the ongoing "pump and dump" scheme, including TFZI and EWKS. The email stated in relevant part: "Dino, here is a list of companies and the time line." Included in the list of eight deals were "EWKS Need to figure out budget ready to go" and "TFZI 3/7." The email concluded: "The most difficult thing is keeping Frank [Morelli] under control [W]e are at the threshold of success Lets open the door and enter the promised land."

36.     On or about March 14, 2009, TFZI completed a reverse merger with Gold Recycle Company, LLC, a private limited liability company.

37.     In order to conceal their involvement, defendant DINO PAOLUCCI and Louis Buonocore used nominees to prevent detection of their relationship with the planned manipulation of TFZI stock. For example, on or about March 18, 2009, Louis Buonocore sent defendant DINO PAOLUCCI an email that included a breakdown of the number of TFZI shares that the nominees and entities of Buonocore and defendant PAOLUCCI would receive. The email stated that Buonocore's associate would receive 10 million shares in the associate's name,

11

Bay State Financial (Buonocore's entity) would receive 50 million shares, and Brainstorm (defendant PAOLUCCI's nominee held in his brother's name) would receive 50 million shares. The email stated that one of Buonocore's associates in Massachusetts would receive another 3 million TFZI shares, and JTV Management (Person No. 3's company) would receive 6 million shares.

38.     On or about March 19, 2009, in preparation for the promotion of TFZI's stock, Person No. 8 (the co-CEO of TFZI) sent an email to defendant DINO PAOLUCCI and Louis Buonocore, copying Frank J. Morelli, III's son-in-law and Daniel Starczewski.  This email, captioned "GOLD PARTY PR," stated: "Here's our next PR, DO YOUR MAGIC!," referring to public relations for TFZI.  Later the same day, Buonocore sent an email to defendant PAOLUCCI suggesting that they edit the document sent to them by Person No. 8.

39.     In or about late March 2009 and early April 2009, at the direction of defendant DINO PAOLUCCI, Frank J. Morelli, III, and Louis Buonocore, TFZI issued misleading press releases, including the following: (a) a March 26, 2009 press release announcing a new marketing plan that included television advertisements on major networks and attendance at trade shows, which the company expected would result in projected revenues of $10 million for the nine months ending on September 30, 2009; and (b) an April 1, 2009 press release announcing a program to reward the referral of new customers with $50 gift cards, and projected an additional $7.5 million from this plan.   According to subsequent public filings, TFZI had revenue of less than $10,000 during the period when these press releases were issued.

40.     On or about April 2, 2009, defendant DINO PAOLUCCI sent an email to Louis Buonocore and Person No. 8, the co-CEO of TFZI.   The email indicated that defendant

12

PAOLUCCI's address was at D Mecatronics, a company partially owned by Person No. 5 (defendant PAOLUCCI's father).  Defendant PAOLUCCI stated: "TFZI up.  Please let's not lose this momentum.  I need to keep this going.  Kindly prepare press for Monday morning."  Person No. 8 responded in follow-up emails to defendant PAOLUCCI stating that he would have the press ready.  He also told defendant PAOLUCCI by email: "Thank's [sic] we want you.  We want you want too male [sic] money."  At the end of the email chain, defendant PAOLUCCI responded: "I feel your vision and with the right tools I will build you a castle."

      41.     In or about April 2009, at the direction of defendant DINO PAOLUCCI, TFZI continued to issue misleading press releases in order to artificially increase the price and trading volume of TFZI stock.  These included: (a) an April 7, 2009 press release announcing that TFZI had hired Rule One Inc. to manage its multi-million dollar advertising, marketing, and public relations, and projecting that every $1 million spent on Rule One's services would result in $4 million in revenue from the sale of gold, resulting in $2.8 million in profits; (b) an April 15, 2009 press release announcing that TFZI had launched a television advertising campaign that was expected to generate $4 million in sales for every $1 million spent on advertising and marketing; (c) an April 23, 2009 press release announcing that TFZI had a new website (www.roylestatebuyer.com) to handle the purchase of jewelry and estate watches, and projecting that the website could generate $7.5 million over the next 12 to 18 months.  The press releases were misleading, in part, because none of these press releases disclosed that the individuals responsible for promoting the stock were using nominees to disguise their identities, or that they were coordinating press releases with the sales of their stock.

13

42.     From on or about March 13, 2009 through on or about May 5, 2009,  as part of their coordination of stock sales with the promotion of the stock, defendant DINO PAOLUCCI, Frank J. Morelli, III, Daniel Starczewski, Louis Buonocore, and their associates sold at least 500 million shares of TFZI for approximately $140,000.  In order to prevent the detection of his connection to the manipulation of TZFI, defendant DINO PAOLUCCI directed that proceeds from stock sales be sent to his nominees and intermediaries, including Brainstorm Consulting, Bay State Financial, and Buonocore's associate.

**Earthworks Entertainment (EWKS)**

43.     In or about 2009, defendant DINO PAOLUCCI also worked on other deals that had been proposed to him by Frank J. Morelli, III, with the understanding that, similar to TFZI, (a) he would work with others who controlled the vast majority of restricted and free trading shares of public companies; (b) press releases would be coordinated with promotions in order to create the false appearance of interest in the companies; (c) stock would be sold in coordination with promotions; and (d) nominees and entities would be used to conceal from the investing public and the SEC the identities of individuals who participated in and profited from the promotions.

44.     In or about early 2009, Frank J. Morelli, III, proposed that defendant DINO PAOLUCCI and Louis Buonocore work with Morelli, Daniel Starczewski, and Danny Colon to promote Earthworks Entertainment ("EWKS") stock.  Morelli, Starczewski, Colon, and their entities and nominees controlled a majority of the stock in the company, and Person No. 8, the CEO of the company, was also working in coordination with them on EWKS.

14

45.     On or about March 30, 2009, Louis Buonocore sent an email to Daniel Starczewski that included the distribution of shares for several deals, including EWKS.  As to EWKS, the email stated: "Break down for EWKS, 75 mill Bay State [Buonocore's entity], 75 mill Brainstorm [defendant DINO PAOLUCCI's nominee], 30 mill Danny Colon, Add"l [sic] 20 mill registered to you to be broken up amongst investors [individuals and entities that were nominees of Morelli and Starczewski and their associates]."  This email was consistent with PAOLUCCI's requirement that participants in manipulations be in control of the vast majority of the stock.  It also concealed defendant PAOLUCCI and Buonocore's ownership of the stock from the SEC, as their stock was in the names of nominee entities.

46.     On or about April 11, 2009, defendant DINO PAOLUCCI and Frank J. Morelli, III, were included in multiple emails discussing the issuance of shares of EWKS.

47.     From on or about May 20, 2009 through in or about July 2009, at the direction of defendant DINO PAOLUCCI, Frank J. Morelli, III, Louis Buonocore, and Danny Colon, EWKS issued multiple misleading press releases, including the following: (a) a May 20, 2009 press release announcing an agreement with Hit Parade Radio to launch a radio station that played "oldies," projecting that the station would generate revenue of more than $5 million; (b) a June 5, 2009 press release announcing that EWKS had entered an agreement to acquire 80% of mixed martial arts social networking site CageMonster.com, which the company stated would generate revenue of $1.9 million; (c) a June 16, 2009 press release announcing that EWKS subsidiary Z-Force Enterprises LLC signed a joint venture agreement with an animation development company to launch Z-Force, an animated children's program that would sell DVDs, posters, and t-shirts; (d) a June 30, 2009 press release announcing Hit Parade Radio was being

broadcast in anticipation of a Fall 2009 launch; (e) a July 7, 2009 press release announcing plans to launch Earthworks Music during the first quarter of 2010; and (f) a July 15, 2009 press release announcing plans to launch a $1 million national television advertising campaign for an instructional video entitled *Mia Hamm's Soccer Secrets*, which the company claimed would raise more than $2 million in revenue.

48.     In a financial statement issued after these press releases were issued, the company stated that it had no revenue during the period.  Thus, these press releases were false and misleading when issued.  In addition, among other things, none of the press releases disclosed the company's current lack of revenue, or revealed that the individuals responsible for promoting the stock were using nominees to disguise their identities, or that they were coordinating press releases with the sales of their stock.

49.     On or about July 21, 2009, in order to prevent detection of his connection to the manipulation of EWKS stock, defendant DINO PAOLUCCI sent Louis Buonocore an email with wire transfer information for the proceeds of the stocks sales, which included the account numbers for Brainstorm Consulting (defendant PAOLUCCI's nominee entity that his brother controlled) and JTV Management (another of defendant PAOLUCCI's nominee entities, which Person No. 3 controlled).

50.     From on or about May 15, 2009 through on or about August 4, 2009, defendant DINO PAOLUCCI, Frank J. Morelli, III, Louis Buonocore, and Danny Colon, through nominees and intermediaries, sold at least approximately 350 million shares of EWKS shares for illicit proceeds of approximately $225,000.

**Kalahari Greentech (KHGT)**

51.     Throughout 2010, defendant DINO PAOLUCCI continued to work with Frank J. Morelli, III, Louis Buonocore, and others to promote and manipulate stocks, including KHGT, using similar methods: (a) working with others who had control of the vast majority of restricted and free trading shares of public companies; (b) coordinating the companies' press releases with promotions, such as defendant PAOLUCCI's email blasts, in order to create the false appearance of interest in the companies; (c) selling the stock in coordination with the promotions; and (d) using nominees and entities to conceal from the investing public and the SEC the identities of individuals who participated in and profited from the promotions.

52.     In 2010, when defendant DINO PAOLUCCI and Louis Buonocore participated with Frank J. Morelli, III, and Daniel Starczewski in the manipulation of the stock of KHGT, a purported wind and solar energy company, KHGT stated in an Accountants Compilation Report that for the six months ending March 31, 2010, the company had no revenue and a net loss of $220,500.  Morelli, his associates, and his nominees had control of the vast majority of KHGT's stock.

53.     In or about early August 2010, prior to the start of the promotion, defendant DINO PAOLUCCI emailed Louis Buonocore, Person No. 3, and another individual, informing them that defendant PAOLUCCI had "write ups" that he "prepared to feature KHGT in the coming week."

54.     From in or about mid-August 2010 through in or about mid-September 2010, defendant DINO PAOLUCCI, assisted by Person No. 3, caused numerous misleading email blasts to be sent out using defendant PAOLUCCI's business name OTC Market Bulls.

17

Each of these email blasts was sent to thousands of recipients.  The titles of these email blasts

include the following:

- August 18, 2010, 9:07 p.m.     OCTMB is BULLISH on KHGT and you should be too!!

- August 31, 2010, 6:16 a.m.     KHGT bottom bounce time!!

- August 31, 2010, 9:10 a.m.     KHGT Kalahari Greentech Announces a Special Dividend of Shares to Investors for Shareholders of Record on September 30, 2010

- August 31, 2010, 9:37 a.m.     KHGT announces a special dividend!!!

- August 31, 2010, 7:24 p.m.     KHGT huge bounce, closes up 50% "green" again

Among other things, these email blasts did not disclose that defendant PAOLUCCI was

coordinating these blasts with the issuance of KHGT press releases and Louis Buonocore's

KHGT stock sales.

    55.  Defendant DINO PAOLUCCI's promotion efforts were successful.  From

on or about August 16, 2010 to on or about September 9, 2010, KHGT's share price ranged from

a low of $.08 per share to a high of $0.44 per share, and average daily trading volume increased

to more than 500,000 shares per day, nearly fifty times greater than its average daily trading

volume the month before the promotional campaign began.

    56.  From on or about August 13, 2010 through on or about August 31, 2010,

Louis Buonocore caused his entity Bay State Financial to sell approximately 1.5 million shares

of KHGT stock.  From these sales during the promotional period, Buonocore generated

approximately $390,000 in illicit proceeds.

18

57.     On or about August 27, 2010, Louis Buonocore wired approximately $190,000 of these proceeds to Bay State Financial's bank account.

58.     On or about August 31, 2010, Louis Buonocore wired approximately $159,000 of these proceeds to Bay State Financial's bank account.

59.     On or about August 31, 2010, in order to prevent detection of his connection to the manipulation of KHGT stock, defendant DINO PAOLUCCI caused Louis Buonocore to wire approximately $70,000 of these illicit proceeds to Brainstorm Consulting (defendant PAOLUCCI's nominee) and $17,500 to JTV Management (Person No. 3's company). Buonocore also sent approximately $32,000 to Praetorian Holdings and Investments (Frank J. Morelli, III's nominee).

60.     Throughout 2009 and 2010, defendant DINO PAOLUCCI continued to use intermediaries, including Person No. 3, to retain, to communicate with, and to pay vendors in order to hide from regulators and the investing public defendant PAOLUCCI's involvement with stock manipulations.  For example, defendant PAOLUCCI directed Person No. 3 to be the contact person for email blasts sent out under several of defendant PAOLUCCI's business names, such as Market Bulls and OTC Market Alerts.  Defendant PAOLUCCI also caused Person No. 3 to pay expenses for these email blasts through her entity JTV Management, which defendant PAOLUCCI used as a nominee.

61.     During 2009 and 2010, defendant DINO PAOLUCCI also used intermediaries, including Person No. 3, to distribute the stock trading proceeds to other intermediaries and nominees in order to hide from regulators and the investing public his involvement with the stock manipulations.  For example, in or about November 2009, at

19

defendant PAOLUCCI's direction, Person No. 3, using an account in the name of JTV Management, wrote and sent a check for $5,000 to Person No. 4, whom defendant PAOLUCCI identified as his girlfriend.  In addition, in or about May and July 2010, respectively, defendant PAOLUCCI caused Person No. 3 to write a $130,000 check to defendant PAOLUCCI's nominee entity, Brainstorm Consulting, and a $30,000 check to Person No. 4, both checks drawn on an account titled in the name of JTV Management.  At defendant PAOLUCCI's direction, checks to Person No. 4 falsely stated that the payment was for "loans" to Person No. 4.

### Manipulations in 2011 and 2012

62.     During 2011 and 2012, defendant DINO PAOLUCCI continued to manipulate stocks.  Defendant PAOLUCCI (a) worked with others to control the majority of restricted and free trading shares of public companies, (b) coordinated the companies' press releases with promotions, such as defendant PAOLUCCI's email blasts, to create the false impression of market interest in the stock, (c) sold stock in coordination with others, and (d) used nominees to hide his involvement in the deals.

### Ecoland (ECIT)

63.     In or about Spring 2011, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Person No. 1 met in the Dominican Republic.  During that meeting, they discussed defendant PAOLUCCI's desire to merge D&R Technology into a public shell company, and the assistance that Person No. 1 could provide with regard to the purchase of such a company. D&R Technology was a wholly owned subsidiary of D Mecatronics, a public company owned in large part by defendant PAOLUCCI, Person No. 5 (PAOLUCCI's father), and Person No. 8.

64.     In or about late July 2011, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Person No. 1 arranged to purchase the vast majority of ECIT's shares, including a control block of 62 million restricted shares and approximately 26,450,000 free trading ECIT shares, for approximately $485,000.  Under the terms of this deal, defendant PAOLUCCI, Morelli, and Person No. 1 arranged to purchase all but 200,000 of ECIT's approximately 88 million shares.

65.     Around this time, defendant DINO PAOLUCCI, Person No. 1, and Frank J. Morelli, III, launched a market manipulation of ECIT stock by purchasing ECIT's shares, promoting and selling its stock, and distributing the proceeds.  Specifically, the schemers agreed to the following:

a.     a party that they controlled would purchase ECIT's restricted shares for approximately $275,000 and then combine the public company ECIT with D&R Technology, then a private company;

b.     Person No. 1 would act as the other schemers' nominee because the SEC had barred Morelli from trading penny stocks and defendant PAOLUCCI's affiliation with D&R Technology limited his ability to sell free trading stock in the combined company;

c.     as the group's nominee, Person No. 1 would cause his entities to purchase the vast majority of ECIT's free trading shares;

d.     defendant PAOLUCCI, with the assistance of the other schemers, would conduct a fraudulent promotional campaign using email blasts, internet promotions, and the issuance of press releases falsely hyping the company and its stock, and not informing investors and potential investors of various material facts, including the schemers' control of

21

ECIT's stock, their responsibility for the promotional campaign, and their intent to sell their own stock;

    e.  the schemers, acting primarily through Person No. 1, would sell company stock in coordination with the promotional campaign; and

    f.  the schemers would divide the stock sale proceeds, with defendant PAOLUCCI receiving approximately 60% and Person No. 1 and Morelli splitting the remainder of the proceeds.

Neither the schemers nor ECIT disclosed this agreement to the market at this point in time or subsequently.

    66.  In or about August 2011, Person No. 1, acting for himself and as a nominee for defendant DINO PAOLUCCI and Frank J. Morelli, III, used his entity Global Media to make initial payments to an escrow agent totaling approximately $155,000 for ECIT's free trading and restricted shares.  Person No. 1 also used his entities Global Media and Sono Associates to purchase approximately 26,450,000 free trading ECIT shares from five shareholders.  Person No. 1 served as a nominee for defendant PAOLUCCI and Morelli to conceal defendant PAOLUCCI's and Morelli's participation and roles in this manipulation.

    67.  On or about August 25, 2011, Person No. 1 caused approximately four million of these free trading ECIT shares to be deposited into Global Media's brokerage account at Spencer Edwards Securities Inc. ("Spencer Edwards").

    68.  In or about September 2011, Person No. 1, with the assistance of Person No. 2, rushed to have additional free trading ECIT shares deposited at an offshore brokerage account that Person No. 1 controlled so that the schemers would be prepared to sell these shares

during the planned promotion of ECIT stock scheduled for early October 2011.  As a result of these efforts, Person No. 1 deposited approximately two million additional free trading ECIT shares into this offshore account.

69.      Prior to September 28, 2011, there had been no trading of ECIT stock in the previous three weeks, and only ten days of minimal trading over the previous nine months. To generate public interest in ECIT's largely dormant stock, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Person No. 1 devised and organized a promotional campaign using misleading press releases and email blasts touting ECIT stock.  Their promotional campaign stretched from approximately October 3, 2011 through February 17, 2012, and broke down into three distinct promotional periods.  The first promotional period ran from approximately October 3, 2011 through November 18, 2011.  After a short lull, the second promotional period began on approximately December 3, 2011 and continued until December 20, 2011.  The third period ran from approximately January 21, 2012 through February 17, 2012.

70.      Throughout the promotional campaign, defendant DINO PAOLUCCI directed ECIT's transfer agent to issue more than a dozen press releases on behalf of ECIT. Defendant PAOLUCCI participated in the preparation of the press releases, most of which were reviewed by Person No. 1, Frank J. Morelli, III, and, starting in October 2011, Louis Buonocore. Defendant PAOLUCCI timed his email blasts to coincide with the issuance of the ECIT press releases, thereby cloaking the email blasts beneath a veil of reliability and legitimacy.

71.      Defendant DINO PAOLUCCI's email blasts were sent out using various promotional business names, including OTC Market Bulls, Insane Pennies, Penny Players Club,

23

OTC Market Alerts, and the Bull Exchange.  These email blasts hyped ECIT and its stock and

were designed to create a sense of urgency among potential investors.

72.     The press releases and email blasts issued during the promotional

campaign had their intended effect and dramatically increased ECIT's share price and trading

volume.

73.     At around the same time that defendant DINO PAOLUCCI was issuing

press releases and email blasts touting ECIT and its stock, the schemers, through Person No. 1

and Person No. 2, were selling their free trading ECIT shares to public investors at artificially

inflated prices.

74.     None of the schemers' press releases or email blasts, however, disclosed

the truth to the investing public, including the following: (i) the schemers had control or

influence over nearly all of ECIT's stock, (ii) they were responsible for authoring and issuing the

press releases and email blasts, and (iii) they were selling their ECIT stock in coordination with

the issuance of the blast emails and press releases.  The omission of these material facts

concealed the schemers' interest in ECIT and created the false and misleading impression that

the promoters truly supported the purchase of ECIT stock as a wise investment.  In reality, the

sole purpose behind the promotional campaign was to generate interest in ECIT stock to

artificially inflate its stock price and trading volume so the schemers could dump their shares at a

profit.

75.     Moreover, defendant DINO PAOLUCCI's email blasts did not disclose

that defendant PAOLUCCI and the other schemers received all of the proceeds generated from

sales of ECIT stock that they controlled.

76.     These statements were materially false and misleading.  A reasonable investor, before making the decision to purchase ECIT stock, would have wanted to know the true economic benefits the schemers were obtaining from the email blasts and their sales of free trading ECIT stock.

77.     During October 2011, defendant DINO PAOLUCCI and Frank J. Morelli, III, grew increasingly dissatisfied with Person No. 1's efforts, as the schemers' nominee, to sell their ECIT stock.  By the end of October 2011, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Person No. 1 had generated less than $200,000 from the sales, which was insufficient to finish paying off the ECIT acquisition, and had paid only approximately $15,000 more of the acquisition price.  As a result, defendant PAOLUCCI asked Louis Buonocore to manage the manipulation going forward and to keep an eye on Person No. 1, who controlled the brokerage accounts where the schemers' free trading ECIT stock were deposited.

78.     In or about early November 2011, to further the manipulation of ECIT stock, Louis Buonocore transferred approximately $100,000 to a bank account controlled by Person No. 1.  The schemers used Buonocore's contribution to help pay off the ECIT acquisition price.  In addition, defendant PAOLUCCI caused Buonocore to assist with the promotion of ECIT and the sale of its free trading shares during the promotion.  The schemers agreed that defendant PAOLUCCI would continue to receive approximately 60% of the ECIT stock sale proceeds, but now Person No. 1, Morelli, and Buonocore would split the remaining profits. Again, neither the schemers nor ECIT disclosed this arrangement to the market or the SEC at this point in time or subsequently.

25

79.     On or about November 1, 2011, Person No. 1, Frank J. Morelli, III, and Louis Buonocore participated in a meeting in New York City with several other stock promoters to plan the further promotion and manipulation of ECIT stock.

80.     Both before and after this meeting, the schemers retained several additional penny stock promoters to tout ECIT and to participate in pre-arranged purchases of free trading shares, for the purpose of manipulating the market for ECIT stock.  For example, one of these promoters sent an email to Louis Buonocore on or about December 21, 2011 identifying purchases of ECIT stock that the promoter and his colleagues had arranged on behalf of the schemers.

81.     On or about November 3 and 4, 2011, Person No. 1 caused approximately $56,000 to be transferred from Global Media's account at JPMorgan Chase to the original owners of ECIT as further payments for the company's shares, bringing the total payments to approximately $226,000.

82.     On or about November 4, 2011, in an effort to complete the merger of ECIT and D&R Technology, defendant DINO PAOLUCCI, Person No. 1, Frank J. Morelli, III, and Louis Buonocore caused the controlling shareholders of ECIT to enter an agreement with D&R Technology to sell their stock for $262,000.

83.     In connection with the execution of this agreement, the schemers continued their promotional campaign.  For example, on or about November 7, 2011, defendant DINO PAOLUCCI caused ECIT to issue a press release announcing this agreement.  In addition, on or about November 6 and 7, 2011, defendant PAOLUCCI caused at least four additional email blasts to be distributed touting ECIT.

26

84.     In or about mid-November 2011, Person No. 1 caused approximately $131,000 to be transferred from the offshore brokerage account that Person No. 1 controlled and from Global Media's account at JPMorgan Chase to the original owners of ECIT as further payments for the company's shares.  Approximately $87,000 of these funds came from Person No. 1's sale of free trading ECIT shares from the offshore brokerage account that he controlled on behalf of the schemers.   As of this point in time, the schemers had paid approximately $357,000 of the $485,000 that they owed for both ECIT's restricted and free trading shares.

85.     In or about December 2011, the second promotional period, the schemers resumed their promotional campaign, causing additional email blasts touting ECIT to be widely distributed.  None of the email blasts disclosed that defendant DINO PAOLUCCI and the other schemers effectively controlled most of ECIT's stock, or that the schemers were profiting by coordinating their stock sales with the email blasts.

86.     The schemers coordinated these email blasts with ECIT press releases that they caused to be issued on December 1, 5, 8, and 15, 2011.

87.     As a result of these promotional campaigns, from September 28, 2011 through the end of December 2011, Person No. 1, as the schemers' nominee, caused approximately 951,000 ECIT shares to be sold from Global Media's account at Spencer Edwards.  Over the same period, Person No. 1 also caused numerous shares of ECIT to be sold from the offshore brokerage account that he controlled.  The schemers used the proceeds to pay for the promotions and to continue paying off the remainder of the ECIT acquisition price, and distributed the rest amongst themselves or to their nominees.

27

88.     On or about December 16, 2011, Person No. 1 caused another payment of the ECIT acquisition price to be made, bringing the total payment to approximately $412,000. Specifically, he caused approximately $55,000 to be transferred from Global Media's account at JPMorgan Chase to the original owners of ECIT as further payments for the company's shares.

89.     During January and February 2012, defendant DINO PAOLUCCI, acting on behalf of the schemers, conducted a third period of email blasts touting ECIT using his stock promotional websites.  These email blasts ran in tandem with (i) additional promotions orchestrated by other individuals and entities hired by the schemers and (ii) additional ECIT press releases that defendant PAOLUCCI caused to be issued.

90.     Again, among other things, none of the email blasts disclosed that defendant DINO PAOLUCCI and the other schemers effectively controlled most of ECIT's free trading stock, or that they were profiting by coordinating their stock sales with the email blasts. The email blasts also made misrepresentations and material omissions concerning the compensation received by the schemers.

91.     During January and February 2012, Person No. 1, as the schemers' nominee, continued to sell the group's free trading ECIT shares in conjunction with these promotional efforts.  The schemers used the proceeds to pay for the promotions and to make the final payments of the ECIT acquisition price, and distributed the rest amongst themselves and their nominees.

92.     As the email blasts and other promotions continued, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Louis Buonocore became increasingly distrustful of their nominee, Person No. 1.  In or about January 2012, defendant PAOLUCCI asked Person No. 1 to

28

give Buonocore access to Global Media's Spencer Edwards account. Although defendant PAOLUCCI, Person No. 1, and Buonocore exchanged various emails regarding their progress in getting Buonocore access to the Spencer Edwards account, Person No. 1 and Buonocore did not include defendant PAOLUCCI on their emails with Spencer Edwards, thereby continuing to conceal his role in the manipulation.

93.     On or about January 19, 2012, Person No. 1 provided verbal authorization to Spencer Edwards for Louis Buonocore to execute trades in Global Media's account at the brokerage firm. As soon as Person No. 1 informed Buonocore about this development, Buonocore notified defendant DINO PAOLUCCI.

94.     On or about January 23, 2012, Louis Buonocore emailed Person No. 1 to inform him that the schemers had sold more than 1.5 million shares of ECIT's stock over the prior three days and they needed to "position some more stock." Buonocore also stated that he had "left some gtc's [good 'til cancelled sell orders] for tom[orrow] morn[ing]" and that the schemers' selling represented approximately 27% of the total trading volume that day.

95.     On or about the next day, January 24, 2012, Louis Buonocore sent another email to Person No. 1 telling him that the schemers only had 900,000 shares of ECIT stock left in the Spencer Edwards brokerage account.

96.     On or about January 30, 2012, Louis Buonocore emailed Person No. 1 and instructed him to fax a written trading authorization to Spencer Edwards so that he could "call in trades and finish off the remaining [ECIT] shares."

97.     Meanwhile, on or about January 27, 2012, the schemers caused the controlling shareholders of ECIT and D&R Technology to revise the agreement that they had

entered in November 2011.   Under the revised agreement, rather than D&R Technology

acquiring the control block of ECIT shares, ECIT agreed to acquire all of the shares of D&R

Technology, thereby making D&R Technology the wholly-owned subsidiary of ECIT.  As part

of this agreement, the owners of D&R Technology (including defendant DINO PAOLUCCI and

his father) became the controlling shareholders of ECIT.

> 98.     During January and February 2012, the schemers sold more than three

million shares of ECIT stock out of the Spencer Edwards account and realized at least $948,000

in illicit proceeds.  The schemers also sold almost $2 million of ECIT stock from Person No. 1's

offshore brokerage account, thus realizing more than approximately $2.9 million in illicit

proceeds between the two accounts during this two-month period.

> 99.     On or about February 29, 2012, Person No. 1 sent an email to Louis

Buonocore attaching a draft consulting agreement between Global Media and Bay State

Financial, to be dated January 16, 2012.  This draft agreement falsely and misleadingly portrayed

Buonocore's business, Bay State Financial, as a consultant to Global Media, providing "market

awareness to potential investors about the prospects" of ECIT.  The draft agreement omitted

various material facts, including the role of defendant DINO PAOLUCCI, the fact that defendant

PAOLUCCI, Person No. 1, Buonocore, and the other schemers were working together to

manipulate the price and volume of ECIT's stock and were splitting the proceeds, and that

Person No. 1, as the schemers' nominee, had been selling ECIT's shares into the manipulated

market and had recently given Buonocore authority to monitor and to trade the schemers'

accounts at defendant PAOLUCCI's request.

100.    In or about February or March 2012, Person No. 1 transferred most of the schemers' unsold free trading shares of ECIT to offshore brokerage accounts held in the names of foreign nominee entities controlled by co-schemers Frank J. Morelli, III, and Louis Buonocore, on their behalf and on behalf of defendant DINO PAOLUCCI.

101.    Between on or about September 30, 2011 and February 23, 2012, through their fraudulent actions, the schemers generated at least approximately $3,299,000 in illicit proceeds from the sale of ECIT stock. Person No. 1, as the schemers' nominee, took responsibility for distributing to the other schemers the proceeds from the brokerage and bank accounts under his control.

102.    Person No. 1 wired funds to Frank J. Morelli, III, and Louis Buonocore directly from certain of the brokerage accounts in his control and also from a Global Media bank account that he controlled. Buonocore then paid certain nominees designated by defendant DINO PAOLUCCI, including at least approximately $1,410,000 to defendant PAOLUCCI's nominees and affiliated entities between December 8, 2011 and April 11, 2012.

103.    On or about March 13, 2012, ECIT changed its name to Novus Robotics, Inc. (ticker symbol NRBT). It filed a Form 8-K with the SEC on April 12, 2012, announcing the name change.

104.    On or about April 4, 2012, Louis Buonocore sent a Federal Express package addressed to defendant DINO PAOLUCCI, at D&R Technology, Mississauga, Ontario. This package contained a Bay State Financial check for approximately $300,000, made payable to Brainstorm Consulting, constituting a portion of defendant PAOLUCCI's proceeds from the ECIT manipulation.

31

105.    Throughout the course of their manipulation, defendant DINO

PAOLUCCI and the other schemers gained control of almost all 22 million of ECIT's free

trading shares and control or influence over 62 million of ECIT's restricted shares, together

representing over 99% of the total shares issued for the company.  Despite having obtained

ownership of more than 5% of ECIT's stock, the schemers, both collectively and individually, in

order to keep their fraudulent and coordinated activity secret, failed to file a Schedule 13D

beneficial ownership report with the SEC, as required, or otherwise disclose publicly their

control of ECIT's securities, their purpose in acquiring the interests, or their plans or proposals

for the acquisition, holding, or disposal of the securities.

**AGR Tools (AGRT)**

106.    In or about 2012, defendant DINO PAOLUCCI continued to manipulate

stocks by: (a) working with others who had control of the vast majority of restricted and free

trading shares of the public companies; (b) coordinating the companies' press releases with

promotions, such as defendant PAOLUCCI's email blasts, in order to create the false appearance

of interest in the companies; (c) selling the stock in coordination with the promotions; (d) using

nominees and entities to conceal from the investing public and the SEC the identities of

individuals who participated in and profited from the promotions.

107.    In or about 2012, due to the effectiveness of defendant DINO

PAOLUCCI's stock promotion of ECIT, Jeffrey Weinfurter and Carl Marciniak asked to join

defendant PAOLUCCI's scheme by having him promote stocks that they planned to manipulate.

108.    In or about 2012, defendant DINO PAOLUCCI explained to Jeffrey

Weinfurter and Carl Marciniak that in order for him to participate, they would have to

demonstrate that they controlled the companies' restricted and free trading shares.  Among other things, defendant PAOLUCCI established the following conditions:

a.    defendant PAOLUCCI would get 60% of the proceeds or more from the sales of any stocks that he promoted, despite the fact that defendant PAOLUCCI had not invested any money in the companies that he was promoting;

b.    defendant PAOLUCCI required that Weinfurter and Marciniak control virtually all of both the restricted and free trading shares in any manipulation in which defendant PAOLUCCI participated;

c.    defendant PAOLUCCI required Weinfurter and Marciniak to provide evidence of their control of the stock through non-public shareholder lists;

d.    defendant PAOLUCCI required Weinfurter and Marciniak to provide approximately ten press releases that could be issued in coordination with his email promotions;

e.    defendant PAOLUCCI demanded that Weinfurter and Marciniak provide him, and at various times his associate Louis Buonocore, log-in codes and passwords for the brokerage accounts from which Weinfurter and Marciniak would be selling their free trading shares so that defendant PAOLUCCI or Buonocore could monitor the trades, coordinate them with defendant PAOLUCCI's

33

promotions, and ensure that defendant PAOLUCCI was receiving 60% of the proceeds;

f.     defendant PAOLUCCI directed that the proceeds of the sale of manipulated stock be transferred from accounts controlled by Weinfurter or Marciniak to accounts controlled by Buonocore or other accounts under the control of defendant PAOLUCCI, after which defendant PAOLUCCI would direct Buonocore or others to send the proceeds to defendant PAOLUCCI's nominees;

g.     in order to conceal their coordination and control from regulators, defendant PAOLUCCI often directed Weinfurter and Marciniak to report to Buonocore, whom defendant PAOLUCCI retained to review shareholder lists and press releases, oversee trading, forward emails, receive proceeds, and distribute proceeds to defendant PAOLUCCI's nominees; and

h.     in order to conceal their coordination from regulators, defendant PAOLUCCI insisted that Weinfurter and/or Marciniak limit email contact with defendant PAOLUCCI, instructed them to use telephone or encrypted messaging services, and required that Weinfurter travel to Toronto to meet with defendant PAOLUCCI in person multiple times for each deal for their most substantive communications.

109.    In or about 2012, Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 acquired control over the public shell corporation AGRT, merged the public shell with a private mining business, obtained control over the vast majority of its free trading and restricted shares, and put in place management that was under their control.

110.    In order to conceal their control of AGRT's free trading shares, Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 deposited their free trading AGRT shares in offshore brokerage accounts.

111.    Carl Marciniak, Jeffrey Weinfurter, and Person No. 9, who together had invested at least $300,000 in the purchase of the AGRT shell, agreed that they collectively would get one-third of the proceeds of the stock promotion, and that defendant PAOLUCCI, who had no investment in the shell, would receive approximately two-thirds of the proceeds.

112.    In order to conceal his coordination with Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 in the manipulation of AGRT stock, defendant DINO PAOLUCCI designated Louis Buonocore as an intermediary between himself and the AGRT shell owners: Marciniak, Weinfurter, and Person No. 9.

113.    In or about February 2012 and April 2012, in order to further conceal their coordination by avoiding the use of telephones, emails, and texts, Jeffrey Weinfurter met with defendant DINO PAOLUCCI in person in Toronto to discuss stock promotions, including AGRT.  At these meetings, Weinfurter explained how the planned manipulation met defendant PAOLUCCI's requirements.

114.    On or about May 16, 2012, Carl Marciniak sent Louis Buonocore a non-public shareholder list for AGRT so that Buonocore could confirm to defendant DINO

PAOLUCCI that the stock of AGRT was in the control of Marciniak, Jeffrey Weinfurter, and Person No. 9. In accordance with PAOLUCCI's directives, Marciniak sent the list to Buonocore in order to conceal Marciniak's and Weinfurter's relationship with defendant PAOLUCCI.

115. Beginning in or about May 2012, defendant DINO PAOLUCCI and others coordinated the issuance of AGRT press releases with defendant PAOLUCCI's dissemination of email blasts.

116. On or about May 21, 2012, a few days before the promotion of AGRT was scheduled to begin, defendant DINO PAOLUCCI, his brother, Person No. 3, and another individual working for defendant PAOLUCCI, whom defendant PAOLUCCI referred to collectively as "Team Bull," exchanged emails in which they discussed the manner in which email blasts touting AGRT would be released. Defendant PAOLUCCI concluded this exchange with an email ending "GO TEAM BULL."

117. On or about May 25, 2012, AGRT issued a press release captioned "AGR Tools Incorporates Wholly Owned Subsidiary." Shortly afterwards, defendant DINO PAOLUCCI caused Person No. 3, Person No. 6, and others to send out multiple misleading email blasts under his business names touting AGRT. Defendant PAOLUCCI and others took these coordinated actions to create the false appearance of market interest in AGRT stock, but concealed their coordination. This press release and these email blasts did not disclose various material facts, including the fact that (i) Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 controlled AGRT through nominees, (ii) defendant PAOLUCCI, Marciniak, and Weinfurter were coordinating AGRT's press releases with defendant PAOLUCCI's email blasts and stock

sales, and (iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock sale proceeds.

118.   From the beginning of April 2012 to mid-May 2012, AGRT stock traded on only nine days, and on these days, averaged less than 2,000 daily shares traded.  On May 25, 2012, the day of the first press release issued as part of the manipulation of AGRT, the daily trading volume of AGRT stock increased to approximately 1.8 million shares.  On the next trading day, May 29, 2012, the trading volume of AGRT increased almost ten-fold, to approximately 17 million shares.

119.   From on or about May 30, 2012 to on or about June 5, 2012, AGRT issued at least four misleading press releases.  Contemporaneously, defendant DINO PAOLUCCI caused Person No. 3, Person No. 6, and others to send out various misleading email blasts touting AGRT.  Again, these press releases and email blasts did not disclose various material facts, including the fact that (i) Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 controlled AGRT through nominees, (ii) defendant PAOLUCCI, Marciniak, and Weinfurter were coordinating AGRT's press releases with defendant PAOLUCCI's email blasts and stock sales, and (iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock sale proceeds.

120.   From on or about June 4, 2012 to on or about June 6, 2012, Jeffrey Weinfurter travelled to Toronto and met with defendant DINO PAOLUCCI to further coordinate the AGRT manipulation.  Defendant PAOLUCCI and Weinfurter met in person to conceal their coordination.  During this visit, as he was sending out email blasts, defendant PAOLUCCI directed Weinfurter to make trades of various quantities of AGRT stock while the two were

sitting together at a hotel.  Defendant PAOLUCCI's directions sought to artificially increase AGRT's trading volume and stock price and to keep the price of the stock from falling too rapidly.

121.    On or about June 5, 2012, Jeffrey Weinfurter forwarded a report regarding AGRT stock to Carl Marciniak, who forwarded the report to Louis Buonocore.  The report showed a dramatic increase in trading volume in the days after defendant DINO PAOLUCCI initiated the email blasts about AGRT.

122.    On or about June 6, 2012, Buonocore forwarded this report to defendant DINO PAOLUCCI.

123.    From on or about June 5, 2012 through in or about mid-July 2012, defendant DINO PAOLUCCI and others continued to coordinate misleading AGRT press releases with defendant PAOLUCCI's email blasts to support the manipulation.  These press releases and email blasts did not disclose various material facts, including the fact that (i) Carl Marciniak, Jeffrey Weinfurter, and Person No. 9 controlled AGRT through nominees, (ii) defendant PAOLUCCI, Marciniak, and Weinfurter were coordinating AGRT's press releases with defendant PAOLUCCI's email blasts and stock sales, or (iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock sale proceeds.

124.    Throughout the promotion, Carl Marciniak, Jeffrey Weinfurter, and Person No. 9, who controlled most of AGRT's free trading shares, sold a substantial amount of their AGRT shares from offshore nominee accounts in coordination with defendant DINO PAOLUCCI's email blasts.

125.    In June through August 2012, Carl Marciniak and Jeffrey Weinfurter transferred approximately two-thirds of the illicit proceeds from their sale of AGRT stock to an offshore entity controlled by Louis Buonocore, who in turn sent funds to defendant DINO PAOLUCCI through nominees.  For example, on or about July 17, 2012, Louis Buonocore sent Carl Marciniak an email telling him that Marciniak and Jeffrey Weinfurter needed to send $195,000 and $250,000, respectively, to defendant PAOLUCCI's brother's entities, Brainstorm and BMJ Marketing.  Buonocore directed Marciniak to wire the remaining funds in his Bay State Financial account.

126.    During the same timeframe, defendant DINO PAOLUCCI also used other nominees to receive illicit proceeds.  For instance, in or about June 2012, defendant PAOLUCCI caused Person No. 3 to use approximately $40,000 of funds that defendant PAOLUCCI had caused to be transferred to her JTV Management account to purchase approximately $40,000 worth of jewelry in North Carolina and then to send the jewelry to defendant PAOLUCCI in Canada.

127.    Similarly, on or about June 25, 2012, defendant DINO PAOLUCCI provided Louis Buonocore with wire transfer information for the Canadian bank account of one of defendant PAOLUCCI's associates.  The next day, Buonocore's Bay State Financial entity transferred $30,000 to that Canadian account.

**LiveWire Ergogenics (LVVV)**

128.    As 2012 progressed, defendant DINO PAOLUCCI continued to manipulate stocks using press releases, email blasts, and tweets.  In an email chain on or about September 2, 2012, in an effort to encourage his team as they prepared for the next promotion,

39

defendant PAOLUCCI wrote: "Prepare to unleash the bulls!" Soon afterwards, defendant

PAOLUCCI's brother reported: "Tweets out people!!!" Defendant PAOLUCCI's brother then

added: "Man the pumps!!! PUMP PUMP PUMP PUMP!!!!!" Later that day, defendant

PAOLUCCI's brother sent another email in the chain, repeating: "Pump pump pump pump. ;)."

129.    After this, defendant DINO PAOLUCCI participated in another stock

manipulation with Jeffrey Weinfurter and Carl Marciniak under the same conditions set by

defendant PAOLUCCI in the AGRT manipulation.

130.    Before late 2012, Jeffrey Weinfurter and Carl Marciniak merged a private

company that manufactured energy chews into a public shell corporation that they had

purchased. The resulting company was called LiveWire Ergogenics ("LVVV"). By late 2012,

Marciniak and Weinfurter controlled the company's CEO and owned or controlled

approximately 98% of the company's free trading shares.

131.    In or about September 2012, Jeffrey Weinfurter met with defendant DINO

PAOLUCCI in Toronto, Canada to discuss stock promotions, including the promotion of LVVV.

Defendant PAOLUCCI and Weinfurter met in person to conceal their coordination.

132.    As with the AGRT manipulation, defendant DINO PAOLUCCI used his

email lists to promote LVVV fraudulently in exchange for 60% of the stock sales proceeds from

the manipulation. In addition, defendant PAOLUCCI had Louis Buonocore conduct due

diligence on the LVVV shell to confirm that Jeffrey Weinfurter and Carl Marciniak controlled

LVVV's restricted and free trading shares. Defendant PAOLUCCI also employed Buonocore as

an intermediary between defendant PAOLUCCI and Weinfurter and Marciniak to conceal

defendant PAOLUCCI's coordination of the manipulation with Weinfurter and Marciniak from regulators and the investing public.

133.    On or about September 24, 2012, Buonocore, acting on behalf of defendant DINO PAOLUCCI, sent an email to Carl Marciniak requesting information on the LVVV shell and its balance sheet.

134.    On or about October 8, 2012, Louis Buonocore sent an email to Carl Marciniak informing him that "Northstar" was back and that "lvvv [i]s a [n]ext." "Northstar" is a name that defendant DINO PAOLUCCI used.

135.    On or about October 8, 2012, Carl Marciniak forwarded Louis Buonocore two shareholder lists for LVVV, which Marciniak had received from LVVV's attorney.  A substantial portion of the free trading shareholders on these lists were individuals and entities under the control of Marciniak and Jeffrey Weinfurter.  Marciniak and Weinfurter held these free trading shares through several nominee entities to conceal their control from regulators and the investing public.

136.    The following day, on or about October 9, 2012, Louis Buonocore forwarded Carl Marciniak's email with the attached shareholder lists to defendant DINO PAOLUCCI so that defendant PAOLUCCI could confirm Marciniak and Weinfurter's control, and the structure that they had established to conceal their control, of LVVV's stock.

137.    On or about October 11, 2012, both Jeffrey Weinfurter and Carl Marciniak sent an email to Louis Buonocore attaching an analysis of LVVV's shareholders, showing which LVVV shares the schemers did and did not control.

138.   Immediately afterwards, on or about October 11, 2012, Carl Marciniak sent an email to Louis Buonocore attaching a draft lock up agreement.  The purpose of the lock up agreement was to prevent the sale of the majority of the free trading LVVV shares not held by the schemers' nominees.

139.   On or about October 18 and 19, 2012, Jeffrey Weinfurter met again with defendant DINO PAOLUCCI in Toronto, Canada to discuss further the manipulation of LVVV and other manipulations.  Again, Weinfurter met with defendant PAOLUCCI in person at defendant PAOLUCCI's insistence to conceal his role in their stock manipulation.

140.   On or about October 22, 2012, Louis Buonocore, acting on behalf of defendant DINO PAOLUCCI, and Carl Marciniak exchanged multiple emails to enable defendant PAOLUCCI to confirm Jeffrey Weinfurter and Marciniak's control of LVVV's restricted and free trading stock.  In these email exchanges, Buonocore requested that Marciniak send him information via facsimile.  Buonocore also requested the login information for brokerage accounts under Marciniak's and Weinfurter's control.  Marciniak responded that he would send Buonocore the log-ins for their offshore brokerage accounts.  Marciniak sent Buonocore the login information later that day.

141.   On or about November 8, 2012, Louis Buonocore summarized Jeffrey Weinfurter and Carl Marciniak's control of LVVV stock in an email that he sent to defendant DINO PAOLUCCI.  In this email Buonocore explained that he had completed his due diligence through the use of login information to the accounts.  He informed defendant PAOLUCCI that 14.6 million free trading LVVV shares were held in nine accounts, and that there were only 75,000 shares that were not under the control of Marciniak and Weinfurter.  The email also

42

included information on the restricted shares.  In addition, as part of their effort to coordinate the issuance of press releases with defendant PAOLUCCI's email blasts, Buonocore stated that LVVV had eight to ten news stories, meaning that the company's CEO was prepared to issue eight to ten press releases in coordination with defendant PAOLUCCI's email blasts and at Marciniak and Weinfurter's direction.  Finally, the email informed defendant PAOLUCCI that Buonocore and defendant PAOLUCCI did not have trading authority over any free trading shares, a fact that would enable defendant PAOLUCCI and Buonocore to conceal their control of the manipulation if they were questioned by regulators.

      142.    On or about November 8, 2012, Carl Marciniak sent an email to Louis Buonocore and Jeffrey Weinfurter, in which Marciniak responded to some of the issues raised by Buonocore.  Buonocore forwarded Marciniak's email to defendant DINO PAOLUCCI the same day.

      143.    On November 8, 2012, Louis Buonocore also forwarded to defendant DINO PAOLUCCI another email attaching a recent non-public LVVV shareholder report.  In this email, Buonocore told defendant PAOLUCCI that the deal was "tight," meaning that Jeffrey Weinfurter and Carl Marciniak exercised control over the vast majority of LVVV's free trading stock.

      144.    From on or about December 5, 2012 through on or about December 8, 2012, Jeffrey Weinfurter met again with defendant DINO PAOLUCCI in Toronto, Canada. During this time, defendant PAOLUCCI and Weinfurter coordinated the issuance of at least four misleading LVVV press releases with multiple misleading email blasts about LVVV that

defendant PAOLUCCI caused to be sent out.  Defendant PAOLUCCI and Weinfurter met in person to conceal this coordination.

145.    From on or about December 5, 2012 through on or about December 8, 2012, defendant DINO PAOLUCCI, during in-person meetings with Jeffrey Weinfurter in Toronto, directed Weinfurter to sell, and sometimes buy, specific quantities of LVVV stock at particular prices in coordination with defendant PAOLUCCI's email blasts in order to make it appear that there was more market interest in the stock than was actually the case, and to avoid rapid declines in the price of the stock.

146.    On December 5, 2012, the first day of the promotion, approximately 3.3 million shares of LVVV stock were sold, which was approximately 900% more stock trades than in the prior 18 months combined.  From December 5, 2012 through December 8, 2012, the days on which Weinfurter was with defendant PAOLUCCI in Toronto, approximately 23 million shares of LVVV were sold, which was approximately 6900% more stock trades than occurred in the prior 18-month period.  More than 13 million of these shares were sold on December 6, 2012. On December 7, 2012, the volume of LVVV shares, while still much higher than before the promotion had begun, dropped significantly, and the price of the shares dropped by approximately 50%.

147.    On or about December 9, 2012, defendant DINO PAOLUCCI was copied on an email chain with the subject line "Captain goes down with the ship :)," in which Person No. 6 (defendant PAOLUCCI's brother), Person No. 3, and another individual working for defendant PAOLUCCI discussed the wording of email blasts that provided potential excuses for

44

LVVV's drop in share price, while asserting that LVVV's energy chews were a great product that was going nationwide and urging investment "in light of all of the recent positive news."

148.   On or about January 6, 2013, Louis Buonocore sent an email to defendant DINO PAOLUCCI, enclosing a report showing how many shares of LVVV were held at each brokerage house for the week ending December 28, 2012.  This report enabled defendant PAOLUCCI and Buonocore to monitor the selling activities of Carl Marciniak and Jeffrey Weinfurter.

149.   From on or about December 5, 2012 through on or about January 7, 2013, defendant DINO PAOLUCCI and others promoted the stock of LVVV by coordinating the issuance of misleading LVVV press releases with the dissemination of numerous misleading email blasts.  The email blasts were sent out using multiple promotional business names, including the Bull Exchange, Best Penny Newsletter, and OTC Market Alerts, at the direction of defendant PAOLUCCI.

150.   Neither the press releases nor email blasts disclosed various material facts, including that defendant DINO PAOLUCCI, Louis Buonocore, Carl Marciniak, and Jeffrey Weinfurter controlled the vast majority of LVVV's free trading shares, that they were coordinating the issuance of LVVV's press releases and defendant PAOLUCCI's email blasts, or that defendant PAOLUCCI, who had no investment in the company and owned none of the stock, would be receiving approximately 60% of the proceeds received by Marciniak and Weinfurter from the promotion of the stock.

151.   From on or about December 6, 2012 through on or about January 7, 2013, during the time that LVVV was promoted by defendant DINO PAOLUCCI, approximately 63

million shares of LVVV stock were sold for approximately $12 million.  During this period, Carl Marciniak and Jeffrey Weinfurter sold free trading shares into the market created by defendant PAOLUCCI's promotions.

152.    In or about early 2013, Carl Marciniak and Jeffrey Weinfurter caused approximately 60% of the proceeds that they fraudulently derived from the sale of their LVVV free trading stock to be transferred from brokerage accounts under their control to defendant DINO PAOLUCCI's nominees.  For example, Marciniak and Weinfurter transferred illicit LVVV sale proceeds from their offshore nominee brokerage accounts to one of Louis Buonocore's offshore brokerage accounts (in the name of his offshore nominee entity Chobest Ltd.), and on or about January 23, 2013, at the direction of defendant DINO PAOLUCCI, Buonocore transferred approximately $1,073,000 of these funds from the Chobest account to BMJ Marketing, a nominee for defendant PAOLUCCI that his brother controlled.  That same day, Buonocore also transferred $115,000 from the offshore Chobest account to Bay State Financial, a company under his control.

153.    On or about January 26, 2013, as further distribution of proceeds from the sale of LVVV stock, Louis Buonocore caused his wife to write a check for $200,000, drawn upon his Bay State Financial account, to defendant DINO PAOLUCCI's girlfriend (Person No. 4).

**Manipulations in 2013**

**YaFarm Technologies, Inc. (YFRM)**

154.    In early 2013, defendant DINO PAOLUCCI participated in another stock manipulation with Frank J. Morelli, III, and Louis Buonocore.  For this manipulation, involving

a public company called YaFarm Technologies, Inc. ("YRFM"), defendant PAOLUCCI imposed similar conditions as he did in the ECIT, AGRT, and LVVV transactions.

155.   In or about 2012, Frank J. Morelli, III, and Louis Buonocore secured control over most of YFRM's restricted and free trading shares.  First, they arranged to merge the Integrated Stem Cell Institute ("ISCI"), a private stem cell facility located in Cancun, Mexico, into YFRM.  Through this arrangement, Morelli and Buonocore caused several nominees to be appointed as YFRM's officers.  The nominee officers, in turn, enabled Buonocore and Morelli to secure control over most of the free trading shares of the company through nominees by in or about January 2013.

156.   As part of the merger transaction, Louis Buonocore and Frank J. Morelli, III, agreed to pay the owner of the private company $250,000, later reduced by agreement to $175,000, from the proceeds of a promotion of YFRM stock.

157.   In or about February 2013, defendant DINO PAOLUCCI, after verifying that Frank J. Morelli, III, and Louis Buonocore had control of YFRM and its free trading stock, began to use his email lists to promote YFRM stock fraudulently.  Defendant PAOLUCCI agreed that proceeds from the sale of YFRM stock controlled by Morelli and Buonocore would be used to pay the owner of the private stem cell company, and that Buonocore would pay approximately 60% of the remaining proceeds to defendant PAOLUCCI.

158.   On or about February 4, 2013, as part of the effort to coordinate the issuance of YFRM press releases with defendant DINO PAOLUCCI's email blasts, a person assisting with the preparation of the YFRM press releases sent an email to Frank J. Morelli, III, Louis Buonocore, and defendant DINO PAOLUCCI, attaching the press release planned for

47

February 5, 2013.  The email address used for defendant PAOLUCCI was

kevinhood_1@hotmail.com.  Kevin Hood was an alias used by defendant PAOLUCCI.

159.    On or about the following day, February 5, 2013, the first day of the

promotion, defendant DINO PAOLUCCI and others coordinated the issuance of a misleading

YFRM press release with defendant PAOLUCCI's misleading email blasts touting YFRM.  The

press release, titled "YaFarm Technologies, Inc. Announces It Has Signed a Definitive

Agreement with the Integrative Stem Cell Institute," touted ISCI as "a premier provider of point-

of-care, stem cell-based therapies for patients from around the world."  In coordination with this

press release, defendant PAOLUCCI disseminated multiple email blasts using several

promotional business names.

160.    Defendant DINO PAOLUCCI's coordinated manipulation with Louis

Buonocore, Frank J. Morelli, III, and others succeeded.  During the two months prior to February

5, 2013, the start date of the promotion, YFRM stock traded on only one day, for a total of

approximately 10,000 shares, and closed at $0.06 per share.  On or about February 5, 2013, the

first day of the promotion, approximately 12 million shares of YFRM stock were sold and the

stock price closed at almost $0.16 per share.

161.    From on or about February 5, 2013 through on or about February 25,

2013, defendant DINO PAOLUCCI coordinated numerous misleading email blasts touting

YFRM with multiple YFRM press releases in order to create the false appearance of market

interest in YFRM stock.  These press releases and email blasts did not disclose various material

facts, including the fact that (i) Louis Buonocore and Frank J. Morelli, III, controlled YFRM

through nominees, (ii) defendant PAOLUCCI, Buonocore, and Morelli were coordinating

YFRM's press releases with defendant PAOLUCCI's email blasts and stock sales, or

(iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock

sale proceeds.

162.    During the promotion and defendant DINO PAOLUCCI's email blasts,

Louis Buonocore and Frank J. Morelli, III, illicitly sold YFRM stock into the manipulated

market.  Buonocore and Marciniak used nominees to conceal their control of YFRM and their

stock sales.

163.    After defendant DINO PAOLUCCI's promotion of YFRM, Louis

Buonocore and Frank J. Morelli, III, distributed approximately 60% of their stock sale proceeds

to defendant PAOLUCCI through nominees to conceal these payments.  For example, on or

about February 25, 2013, at the end of defendant PAOLUCCI's promotional activity for YFRM,

Buonocore transferred approximately $147,000 from an offshore brokerage account under his

control (in Chobest's name) to BMJ Marketing, a nominee for defendant PAOLUCCI.

Similarly, on or about March 11, 2013, Buonocore transferred approximately $100,000 from the

offshore Chobest account to BMJ Marketing.

### Resource Ventures Inc. (REVI)

164.    Soon after the YFRM manipulation, defendant DINO PAOLUCCI

participated in another stock manipulation with Jeffrey Weinfurter and Carl Marciniak.  This

manipulation involved the stock of Resource Ventures Inc. ("REVI").

165.    REVI was a publicly traded company over which Carl Marciniak and

Jeffrey Weinfurter, together with two other individuals, had obtained control.  Marciniak,

Weinfurter, and the two other individuals deposited their free trading REVI shares in multiple

offshore nominee accounts to conceal their control over these free trading shares.  Finally,

Marciniak, Weinfurter, and these two individuals merged a private company, Global Energy

Management Ltd. ("GEM"), a purported energy investment company, into REVI.

166.    In or about early 2013, defendant DINO PAOLUCCI began to promote

REVI stock, after Carl Marciniak, Jeffrey Weinfurter, and those working with them satisfied his

standard conditions, including but not limited to the following:

a.      before the manipulation began, the participants would own or

control almost all of the restricted and free trading stock;

b.      REVI would have approximately ten press releases ready to be

issued in coordination with defendant PAOLUCCI's email blasts;

c.      defendant PAOLUCCI or his intermediaries would have the ability

to access all brokerage accounts held by deal participants and

monitor their trading; and

d.      defendant PAOLUCCI would receive approximately 60% of the

proceeds from the promotions in which he participated.

167.    On or about October 11, 2012, as directed by defendant DINO

PAOLUCCI, Carl Marciniak forwarded a draft agreement to Louis Buonocore by email.  The

draft contract, between two significant shareholders of REVI, on the one hand, and Marciniak

and Jeffrey Weinfurter, on the other, reflected an agreement to document a split of the proceeds

of any REVI stock sold.  Under the terms of the agreement, defendant PAOLUCCI and

Buonocore, who are not named in the agreement, would get 60% of the proceeds in an offshore

account under the name of Chobest Ltd. (one of Buonocore's offshore corporations), two

significant REVI controlling shareholders would get 20% in their offshore account, and Marciniak and Weinfurter would get 20% in the name of Zenlux (an offshore corporation that they controlled).

168.     On or about October 18, 2012, as directed by defendant DINO PAOLUCCI, Carl Marciniak sent an email to Louis Buonocore attaching a chart which included information that Marciniak, Jeffrey Weinfurter, and other individuals working with them controlled approximately 31.5 million free trading shares of REVI stock.  The chart showed that only approximately 50,000 free trading REVI shares were out of their control, approximately 46 million free trading REVI shares were in a lock up agreement, and approximately 4,000 free trading shares were in certificate form.  The chart also showed that approximately 295 million restricted REVI shares were held by affiliates and approximately 30,000 restricted shares were held by others.  The purpose of this email was to demonstrate to Buonocore, defendant PAOLUCCI's agent, the control that Weinfurter and Marciniak had over the REVI stock.  As with many other emails to Buonocore, Marciniak sent this email to Buonocore rather than defendant PAOLUCCI to conceal Marciniak and Weinfurter's coordination with defendant PAOLUCCI.

169.     On or about January 9, 2013, Carl Marciniak sent Louis Buonocore and Jeffrey Weinfurter another email attaching a chart that listed the number of REVI shares, where those shares were held, and whether or not those shares were under the control of Marciniak, Weinfurter, or their affiliates.

170.    From on or about January 10, 2013 to on or about January 11, 2013,

Jeffrey Weinfurter travelled to Toronto, Canada to discuss the fraudulent stock promotion with

defendant DINO PAOLUCCI.

171.    As with the prior manipulations, defendant DINO PAOLUCCI, Jeffrey

Weinfurter, and Carl Marciniak coordinated the issuance of misleading REVI press releases with

defendant PAOLUCCI's distribution of misleading email blasts touting the stock.  For example,

on or about March 17, 2013, the day before the start of the REVI promotion, defendant DINO

PAOLUCCI, his brother (Person No. 6), Person No. 3, and another individual working for

defendant PAOLUCCI participated in an email chain with the subject line "Re: Tomorrows alert

- kickoff."  This email chain circulated drafts of the initial email blast for the REVI promotion,

which the participants planned to use the next day.

172.    On or about March 18, 2013, the first day of the REVI promotion, at the

direction of defendant DINO PAOLUCCI, REVI issued a misleading press release titled

"Resource Ventures, Inc. Acquires Global Energy Management Ltd., an Independent Energy

Investment Company."  This press release stated that the acquisition of Global Energy

Management was valued at $10 million, and brought several projects that were in early to late

stage development, including a power plant in Africa.  The same day, defendant PAOLUCCI

caused his brother (Person No. 6), Person No. 3, and others to send out email blasts under his

various promotional business names touting REVI stock.  This press release and these email

blasts did not disclose various material facts, including the fact that (i) Carl Marciniak and

Jeffrey Weinfurter controlled REVI through nominees, (ii) defendant PAOLUCCI, Marciniak,

and Weinfurter were coordinating REVI's press releases with defendant PAOLUCCI's email

blasts and stock sales, or (iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock sale proceeds.

173.   The control that defendant DINO PAOLUCCI, Carl Marciniak, and Jeffrey Weinfurter exercised over REVI's stock and their coordination of the misleading press releases and email blasts were successful in manipulating the market for REVI stock.  On or about March 18, 2013, the first day of the promotion, approximately 20 million shares of REVI stock were sold.  In the prior thirteen months, less than 325,000 shares had been sold.  The closing price on March 18, 2013 was approximately $0.14 per share, up from approximately $0.03 per share on March 14, 2013, the previous day that the stock traded.

174.   From on or about March 18, 2013 to on or about April 1, 2013, defendant DINO PAOLUCCI and others continued to coordinate misleading REVI press releases and numerous email blasts touting REVI.  These press releases and email blasts did not disclose various material facts, including the fact that (i) Carl Marciniak and Jeffrey Weinfurter controlled REVI through nominees, (ii) defendant PAOLUCCI, Marciniak, and Weinfurter were coordinating REVI's press releases with defendant PAOLUCCI's email blasts and stock sales, or (iii) defendant PAOLUCCI, the promoter, would be receiving approximately 60% of the stock sale proceeds.

175.   As a result of this manipulation, from on or about March 18, 2013 to on or about April 4, 2013, approximately 64 million REVI shares were sold for a total of approximately $6.3 million.

176.   Jeffrey Weinfurter and Carl Marciniak sold many of their free trading REVI shares from their offshore nominee accounts during this promotion.  Weinfurter and

Marciniak paid approximately 60% of the proceeds to defendant DINO PAOLUCCI by transferring the funds to defendant PAOLUCCI's nominees.  For example, on or about April 15, 2013, Jeffrey Weinfurter and Carl Marciniak caused proceeds to be transferred to Louis Buonocore's offshore Chobest account, and then defendant DINO PAOLUCCI caused Buonocore to send approximately $565,000 from this offshore account to BMJ Marketing, a nominee entity that defendant PAOLUCCI's brother controlled.

177.     On or about July 22, 2013, less than four months after defendant DINO PAOLUCCI's promotion of REVI, the President of REVI issued a press release announcing that REVI was discontinuing its business association with Global Energy Management, the private company that had been merged into REVI, in part because the shareholders "have derived no economic benefit."

### 2013 Novus Robotics (NRBT) Promotion

178.     In or about June 2013, defendant DINO PAOLUCCI, Frank J. Morelli, III, and Louis Buonocore still owned free trading shares of stock in NRBT, as not all shares of ECIT had been sold before the company changed its name and ticker symbol from Ecoland (ticker ECIT) to Novus Robotics (ticker NRBT).

179.     In or about June 2013, as a result of the manipulations of the stocks of AGRT, LVVV, YFRM, REVI, and other public companies, the fraudulent promotions conducted by defendant DINO PAOLUCCI using his email blasts were no longer as successful as he had hoped, as the rapid rise and subsequent drop in the prices of those stocks appeared to have made investors wary of the recommendations that defendant PAOLUCCI had made in those email blasts.

180.    In or about June 2013, defendant DINO PAOLUCCI began testing the use of radio advertisements as a means of fraudulently promoting stocks.

181.    On or about June 28, 2013, defendant DINO PAOLUCCI caused an associate to email a draft script for an email advertisement concerning NRBT to a marketing company that specialized in purchasing airtime for radio advertisements from broadcasting companies ("Company A").  The email noted that the budget for the advertisement would be $50,000.

182.    On or about July 5, 2013, defendant DINO PAOLUCCI caused $50,000 to be transferred by wire to Company A.  These funds were transferred from an offshore brokerage firm that Frank J. Morelli, III, and Louis Buonocore used to sell manipulated stocks on behalf of themselves and defendant PAOLUCCI.

183.    On or about July 9, 2013, a representative of Company A emailed Person No. 10 and attached a revised script for an NRBT radio advertisement.  In the email, the Company A representative stated that the broadcasters had noted that the NRBT website referenced in the original script did not exist, and Company A had added the website for NRBT's parent company, D&R Technology, to the script.

184.    From on or about July 15, 2013 through on or about July 21, 2013, on a daily basis, radio advertisements touting NRBT were played on multiple stations and Sirius/XM radio.  As a result of the promotion, the volume of NRBT trading increased to over a million shares for the first time in 2013, and trading volume during, and in the week after, the promotional period ranged from 1.2 million shares to 2.5 million shares per day.

**Refill Energy (REFG)**

185.    In or about 2013, three associates of Frank J. Morelli, III, acquired a controlling interest in a public company called Refill Energy Inc. ("REFG").  Subsequently, REFG merged with a private company.  As of August 13, 2013, REFG operated under the name of Medical Cannabis Payment Solutions.  Morelli's three associates controlled REFG's restricted and free trading shares.

186.    In or about mid-2013, Frank J. Morelli, III, agreed to assist these individuals by paying for expenses that were necessary to enable the sale of REFG shares to the public.  In exchange, Morelli received shares of the shell company, which he planned to sell during the promotion of the stock.

187.    In or about mid-2013, defendant DINO PAOLUCCI conducted a one-month radio campaign to promote REFG fraudulently, subject to several familiar conditions, including the following:

    a.    Morelli and his three associates must control REFG's restricted and free trading stock;

    b.    defendant PAOLUCCI must have access to REFG shareholder lists and to all brokerage accounts so that he could confirm the control of REFG stock and monitor their trading;

    c.    defendant PAOLUCCI would exercise control over the trading;

    d.    defendant PAOLUCCI would have control over the timing and content of press releases and promotions, which would be initiated in coordination with stock trading; and

    e.      defendant PAOLUCCI would receive the first $300,000 of proceeds of the stock sales of REFG to cover the costs of promotion, after which he would receive approximately 50% of the proceeds of stock sold during the promotional period.

188.    Defendant DINO PAOLUCCI, Frank J. Morelli, III, and the three individuals took several steps to conceal defendant PAOLUCCI's coordination with Morelli and the three individuals. For instance, defendant PAOLUCCI received his compensation through a nominee. In addition, the parties prepared a fraudulent contract reflecting that defendant PAOLUCCI was owed $1 million for his promotional work. The purpose of the fraudulent contract was to disguise from regulators and the investing public the fact that defendant PAOLUCCI was receiving a percentage of the proceeds.

189.    In or about mid-2013, Jeffrey Weinfurter participated in the manipulation of REFG stock with defendant DINO PAOLUCCI, Frank J. Morelli, III, and others by working with a broker who was willing to sell stock into the manipulation even if he did not have any sellers because Weinfurter and the broker had an agreement that Weinfurter would supply the broker with additional stock as needed.

190.    On or about July 19, 2013, in a conversation with a Company A representative, defendant DINO PAOLUCCI stated that he was a media buyer, and that his business was called Brainstorm Consulting. Defendant PAOLUCCI also provided the Company A representative with defendant PAOLUCCI's telephone number and gave his email address as kevinhood_1@hotmail.com.

191.    On or about July 23, 2013, in order to provide defendant DINO

PAOLUCCI with access to his brokerage accounts, Frank J. Morelli, III, sent defendant DINO

PAOLUCCI an email that included the new password for one of Morelli's nominee brokerage

accounts.

192.    From on or about July 30, 2013 to on or about August 1, 2013, Jeffrey

Weinfurter met with defendant DINO PAOLUCCI in Toronto, Canada, to discuss, among other

things, the fraudulent promotion of REFG.

193.    On or about August 2, 2013, defendant DINO PAOLUCCI emailed

Company A a draft script for a radio advertisement that included a disclaimer that said the

company responsible for the advertisement was "BBMJ Marketing," a name almost identical to

the name of his brother's company, BMJ Marketing.  In the email, defendant PAOLUCCI

requested a four-week radio advertising campaign for August 18 through September 15, 2013.

194.    On or about August 9, 2013, defendant DINO PAOLUCCI caused

approximately $199,980 to be transferred from BMJ Marketing, his nominee entity, to Company

A to pay for the radio campaign.  The previous day, Company A had sent an invoice for

$200,000 to BBMJ Marketing addressed to Person No. 6, defendant PAOLUCCI's brother, as

CEO and Officer of BBMJ Marketing.

195.    Defendant DINO PAOLUCCI coordinated this radio campaign with the

issuance of misleading press releases by REFG, issued on or about August 7, 12, and 13, 2013.

These press releases did not disclose various material facts, including the fact that (i) Morelli and

the three individuals controlled REFG's stock, (ii) defendant PAOLUCCI and others were

coordinating REFG's press releases with defendant PAOLUCCI's radio ads and stock sales, or

(iii) defendant PAOLUCCI, the promoter, would be receiving approximately 50% of the stock sale proceeds.

196.    Starting soon afterwards, from on or about August 19, 2013 through on or about September 15, 2013, defendant DINO PAOLUCCI caused misleading radio advertisements touting REFG to play on radio stations nationwide.  These advertisements stated that REFG "was expanding the legitimate market for medical marijuana by providing supply and distribution technology" and that REFG had "potential for growth."  Neither the radio ads nor the website Spotlightstock.com, to which the ads directed listeners, disclosed that the parties who controlled both REFG's restricted and free trading shares were paying for the ads, or that the ad campaign had been coordinated with the issuance of press releases.  In addition, the Spotlightstock.com website falsely claimed that the promoter was being paid by a "non controlling third party," when in fact defendant DINO PAOLUCCI was the promoter, and knew that the "third party" was in fact a group of individuals who controlled the majority of the stock in REFG.

197.    During the promotion of REFG, an agent from the Federal Bureau of Investigation visited Frank J. Morelli, III's office on or about August 21, 2013 and asked Morelli about his participation in stock manipulations.  Soon afterwards, Morelli told defendant DINO PAOLUCCI about the visit.  Defendant PAOLUCCI provided Morelli with directions on how to conceal their coordination of stock manipulations.  Specifically, defendant PAOLUCCI instructed Morelli to start calling him on a different telephone number.  Defendant PAOLUCCI also instructed Morelli to obtain a new telephone number himself, and to use this new number to

call defendant PAOLUCCI's new number.   Defendant PAOLUCCI and Morelli continued to communicate afterwards using these new, secret telephone numbers.

198.   During the one-month period from on or about August 18, 2013 to on or about September 15, 2013, the time period in which defendant DINO PAOLUCCI caused misleading radio advertisements touting REFG to be played nationwide, approximately 5 million shares of REFG shares were sold, with closing prices ranging from approximately $0.34 per share to as much as $0.64 per share.   During the prior approximately four and a half months, only approximately 500,000 REFG shares were sold, with only two days of any significant volume in the week before the promotion started.

199.   From on or about September 10, 2013 through September 12, 2013, Jeffrey Weinfurter traveled to Toronto, Canada and met with defendant DINO PAOLUCCI in person.

200.   On or about September 12 and 19, 2013, defendant DINO PAOLUUCI received approximately $250,000 and $99,000, respectively, from the illicit proceeds of the REFG stock sales through a nominee.

**Greenway Technologies and Crown Marketing**

201.   During 2012 and 2013, as part of his continuing scheme, defendant DINO PAOLUCCI continued to participate in stock manipulations with multiple individuals, including Louis Buonocore, Frank J. Morelli, III, Carl Marciniak, Jeffrey Weinfurter, and others. Defendant PAOLUCCI continued to insist that in any deals in which he participated he have access to the brokerage accounts of other participants, and that the schemers have total control of the stock.

202.    In or about Fall 2012, defendant DINO PAOLUCCI agreed to assist Frank J. Morelli, III, and others in the manipulation of Crown Marketing ("CRWN") on the condition that the parties hiring him control the company's restricted and free trading shares, all shares were ready to be sold, and defendant PAOLUCCI, through Louis Buonocore, would be able to verify the ownership and status of all CRWN stock through access to the brokerage accounts of the individuals holding the stock.

203.    On or about October 15, 2012, Frank J. Morelli, III, sent an email to one of the other participants in the CRWN deal, stating: "It is very important that you switch the ownership of the other corps (such as Fortune) so that when Dino goes online he can verify the ownership.  You can switch ownership once Dino is completed."  Morelli subsequently forwarded the documents that he received in response to this email to Louis Buonocore, who forwarded them to defendant DINO PAOLUCCI at the email address kevinhood_1@hotmail.com, thereby attempting to conceal defendant PAOLUCCI's role in the manipulation.

204.    In or about Fall 2012, defendant DINO PAOLUCCI declined to participate further in CRWN due to the failure of other participants to comply with his conditions regarding timeliness and the provision of information to him by other participants.

205.    In or about 2013, defendant DINO PAOLUCCI initially agreed to participate in a stock manipulation of Greenway Technologies ("GWYT") with Frank J. Morelli, III, and others, but changed his mind after learning that although the other schemers had control of virtually all of the company's free trading shares, they did not control approximately 10 million of the restricted shares.  Defendant PAOLUCI told Morelli that he would not participate

due to defendant PAOLUCCI's concern that the restricted shares might become free trading, which could result in defendant PAOLUCCI losing control of the trading.

**Manipulation in 2014 and 2015**

206.    In or about late 2013 and early 2014, Frank J. Morelli, III, and Louis Buonocore participated in another manipulation with defendant DINO PAOLUCCI, to promote NRBT stock.  At this time, both Morelli and Buonocore had free trading shares of NRBT that they had not sold in the prior promotions of ECIT and NRBT.  Person No. 1 also still had approximately two million shares of NRBT stock as a result of his participation in the ECIT deal in 2011 and early 2012.  Defendant PAOLUCCI continued to exercise significant control over NRBT.

207.    In or about late 2013 and early 2014, defendant DINO PAOLUCCI told Frank J. Morelli, III, that defendant PAOLUCCI, Morelli, and Louis Buonocore would each pay $100,000 toward expenses for radio advertisements promoting NRBT.

208.    In or about late 2013 or early 2014, Frank J. Morelli, III, obtained the funds from Jeffrey Weinfurter and another individual, and then transferred $100,000 through a nominee to defendant DINO PAOLUCCI's nominee, Person No 10.

209.    On or about January 22, 2014, Louis Buonocore transferred approximately $100,000 from one of his Bay State Financial bank accounts to an offshore account for an entity controlled by defendant DINO PAOLUCCI's nominee, Person No. 10.

210.    In or about 2013 and early 2014, defendant DINO PAOLUCCI attempted to prevent the transfer agent who was handling NRBT stock from allowing Person No. 1 to obtain access to his remaining free trading stock in NRBT, as defendant PAOLUCCI would have

no control over Person No. 1's trading, and the rapid sale of a substantial amount of stock by

Person No. 1 during the promotion was likely to put downward pressure on the price of the

stock, thereby undermining PAOLUCCI's profits from the promotion.  In addition, the rapid sale

of a substantial amount of stock could alert the SEC, causing the agency to halt trading of the

stock.

211.    In or about February 25, 2014, in an email to defendant DINO

PAOLUCCI's attorney, the transfer agent who was handling NRBT stock stated that the "[l]ast

thing I want to do is upset Dino. . . .  I have no choice.  I would love to deny the transfer [to

Person No. 1] but I am not permitted."  Defendant PAOLUCCI subsequently decided not to

continue his attempt to block the transfer.

212.    In or about late February or early March 2014, defendant DINO

PAOLUCCI arranged for Company A, the marketing company, to schedule another radio

campaign for NRBT.

213.    On or about March 3, 2014, a Company A representative emailed

defendant DINO PAOLUCCI a proposed plan to market NRBT on Sirius/XM radio and local

radio stations.

214.    On or about March 4, 2014, the Company A representative emailed

defendant DINO PAOLUCCI and his brother (Person No. 6) an invoice for $203,260 to place

radio advertisements for NRBT during a campaign scheduled for March 17, 2014 through April

13, 2014.

215.    On or about March 5, 2014, Person No. 6 signed the proposed plan for the

upcoming radio advertisement campaign.

216.   On or about March 6, 2014, defendant DINO PAOLUCCI caused BMJ

Marketing to transfer $199,980 to Company A to pay for the planned radio campaign for NRBT.

217.   On or about March 20, 2014, at the direction of defendant DINO

PAOLUCCI, NRBT issued a press release titled "D & R Technology Succedes [sic] in

Penetrating New Markets."

218.   On or about March 26, 2014, at the direction of defendant DINO

PAOLUCCI, NRBT issued a press release titled "D & R Technology Expands Product

Portfolio."

219.   Although the two press releases issued by NRBT included disclosures that

informed investors of various risks, and referred potential investors to SEC filings dated back to

December 31, 2012, neither the press releases nor the SEC filings disclosed that NRBT stock

was being promoted by defendant DINO PAOLUCCI, the son of a board member and president

of the company, in coordination with other shareholders who were funding the payments for

advertisements, selling their stock offshore in the names of nominees, and kicking back a

percentage of the proceeds to defendant PAOLUCCI.

220.   From on or about March 17, 2014 to on or about April 18, 2014, at the

direction of defendant DINO PAOLUCCI, misleading radio advertisements touting NRBT were

played nationwide, including in this district, on local radio stations, nationally syndicated radio

shows, and Sirius/XM, including on channels for CNBC, CNN, CNN Headline News, ESPN

Radio, Fox Business, Fox News, XM Bloomberg Radio, and XM Potus.  The radio

advertisements, which were coordinated with the issuance of NRBT press releases, were

successful in furthering the "pump and dump" scheme, as they resulted in a large increase in the

volume of NRBT stock being sold at significantly higher prices than the average NRBT stock sales before the promotion.

221.   In or about March 2014, during the radio promotion of NRBT, Louis Buonocore began selling the NRBT shares that he was holding at an offshore brokerage firm on behalf of himself and defendant DINO PAOLUCCI.

222.   In or about April 2014, after criminal charges against Frank J. Morelli, III, Louis Buonocore, Jeffrey Weinfurter, and Carl Marciniak involving a different securities fraud were made public record, Buonocore continued to sell the NRBT shares that he was holding in an offshore account on behalf of himself and defendant DINO PAOLUCCI.  After Buonocore started the sale of the NRBT shares in his account, Frank J. Morelli, III's nominee began selling Morelli's shares.  The schemers had agreed that Buonocore should sell his shares first in order to avoid downward pressure on the stock price by having too many shares available for sale at one time.

223.   In or about July and August 2014, defendant DINO PAOLUCCI attempted to have more NRBT stock made available to persons and entities under his control by seeking to have stock held by D Mecatronics released from a global lock that had been placed on the stock.

224.   In or about August 2014, defendant DINO PAOLUCCI caused Person No. 6 (his brother) to send multiple documents to a transfer agent in order to have access to additional shares of NRBT stock under his control by having the restrictions removed from several million shares of NRBT stock, and having those now free trading shares transferred to Brainstorm Consulting, his brother's entity.

225.     The documents that Person No. 6 sent to the transfer agent included two certificates dated August 12, 2014 and August 13, 2014, which respectively transferred 1,464,996 shares and 2,600,368 shares of restricted NRBT stock to Person No. 6's company, Brainstorm Consulting, as well as a Sellers Representation Letter signed by Person No. 6, and an opinion letter from an attorney stating that the restrictive legend should be removed from the stock certificates, thereby making those shares free trading.

226.     On or about August 28, 2014, the transfer agent sent defendant DINO PAOLUCCI an email informing him that his brother had made errors in some of the documents pertaining to the removal of restriction from the restricted NRBT stock that defendant PAOLUCCI and his brother were attempting to transition to free trading stock.  The following day, a transfer agent employee noted that defendant PAOLUCI had requested that paperwork be returned to him at "Dino @ D&R Tech."

227.     On or about April 1, 2015, defendant DINO PAOLUCCI was interviewed by telephone by the SEC as part of an investigation that the SEC was conducting of ECIT. During the interview, defendant PAOLUCCI, in order to avoid having the SEC halt present and future trading of NRBT stock, and also to avoid other legal action which could prevent him from continuing his scheme to engage in stock manipulations and/or maintain his profits from previous manipulations, falsely told the SEC, among other things, that defendant PAOLUCCI:

    a.    had never been given authority to act on behalf of NRBT;

    b.    had never owned any NRBT stock directly or indirectly (although the shares that Louis Buonocore and Frank J. Morelli, III, held offshore were jointly owned with defendant PAOLUCCI);

c.  had never spoken to the transfer agent for NRBT;

d.  had never heard of Ecoland;

e.  had never entered a deal with Person No. 1 related to the proceeds of ECIT stock;

f.  had never met Person No. 1 in person;

g.  had never heard of Person No. 1's entities, Sono Associates, Global Media, or Crimson Marketing;

h.  had never met Morelli;

i.  was not aware of any work that Buonocore did for NRBT;

j.  had been loaned money by Buonocore, but defendant PAOLUCCI could not remember the amount of the loan;

k.  did not know why Buonocore's entity Bay State Financial paid for NRBT radio advertisements, or whether defendant PAOLUCCI's brother had a role in placing the advertisements;

l.  had no involvement with Bay State Financial;

m.  had no agreement with Bay State Financial;

n.  did not know that Person No. 1 had attempted to remove restrictions on NRBT stock before the start of the radio promotion; and

o.  had not done any work for the Bull Exchange.

## WIRES

228.     On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendant

### DINO PAOLUCCI,

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, caused to be transmitted by means of wire communication in interstate

and foreign commerce the writings, signs, signals, and sounds described below for each count,

each transmission constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 1 | 12/8/11 | The transmission of an ECIT press release |
| 2 | 12/15/11 | The transmission of an ECIT press release |
| 3 | 1/24/12 | The transmission of an ECIT press release |
| 4 | 1/26/12 | The transmission of an ECIT press release |
| 5 | 1/30/12 | The transmission of an ECIT press release |
| 6 | 2/1/12 | The transmission of an ECIT press release |
| 7 | 2/6/12 | The transmission of an ECIT press release |
| 8 | 2/8/12 | The transmission of an ECIT press release |
| 9 | 2/10/12 | The transmission of an ECIT press release |
| 10 | 3/20/14 | The transmission of a NRBT press release |
| 11 | 3/26/14 | The transmission of a NRBT press release |
| 12 | 3/17/14 | The broadcast of a NRBT radio ad on Sirius XM |
| 13 | 3/17/14 | The broadcast of a NRBT radio ad on WYFL-AM |
| 14 | 3/22/14 | The broadcast of a NRBT radio ad on Sirius XM |
| 15 | 3/24/14 | The broadcast of a NRBT radio ad on WYFL-AM |
| 16 | 3/30/14 | The broadcast of a NRBT radio ad on Sirius XM |
| 17 | 4/1/14 | The broadcast of a NRBT radio ad on WYFL-AM |
| 18 | 4/5/14 | The broadcast of a NRBT radio ad on Sirius XM |
| 19 | 4/11/14 | The broadcast of a NRBT radio ad on WYFL-AM |
| 20 | 4/13/14 | The broadcast of a NRBT radio ad on Sirius XM |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2.

## COUNT TWENTY-ONE
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 29 and 62 through 105 of Count One are incorporated here.

2.      From in or about at least Spring 2011 through in or about 2012, in the Eastern District of Pennsylvania and elsewhere, defendant

**DINO PAOLUCCI,**

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of ECIT stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-TWO
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 29, 106 through 108, and 128 through 153 of Count One are incorporated here.

2.      From in or about at least September 2012 through in or about 2013, in the Eastern District of Pennsylvania and elsewhere, defendant

### DINO PAOLUCCI,

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of LVVV stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-THREE
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.     Paragraphs 1 through 29, 106, and 154 through 163 of Count One are incorporated here.

2.     From in or about at least September 2012 through in or about 2013, in the Eastern District of Pennsylvania and elsewhere, defendant

**DINO PAOLUCCI,**

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of YFRM stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-FOUR
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 29, 106 through 108, and 164 through 177 of Count One are incorporated here.

2.      From in or about at least September 2012 through in or 2013, in the Eastern District of Pennsylvania and elsewhere, defendant

### DINO PAOLUCCI,

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of REVI stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-FIVE
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 29, 106 through 108, and 185 through 200 Count One are incorporated here.

2.      From in or about early 2013 through in or about late 2013, in the Eastern District of Pennsylvania and elsewhere, defendant

**DINO PAOLUCCI,**

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of REFG stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-SIX
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1. Paragraphs 1 through 29, 178 through 184, and 206 through 227 of Count One are incorporated here.

2. From in or about 2013 through in or about mid-2015, in the Eastern District of Pennsylvania and elsewhere, defendant

**DINO PAOLUCCI,**

together and with others known and unknown to the Grand Jury, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of NRBT stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    As a result of the violations of Title 18, United States Code, Section 1343, and Title 15, United States Code, Section 78ff, defendant

**DINO PAOLUCCI**

shall forfeit to the United States of America any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of such offenses, including, but not limited to, the sum of approximately $8.4 million.

      2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the Court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

for **WILLIAM M. McSWAIN**
**United States Attorney**

76