THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 16-503 |
| DINO PAOLUCCI | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. §§ 3582(c)(1)(A)(i) AND 3582(c)(2)**

Defendant Dino Paolucci seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given that the defendant does not present an "extraordinary and compelling reason" allowing consideration under the statute for this exceptional remedy.

Paolucci also seeks a sentence reduction under 18 U.S.C. § 3582(c)(2), based on a retroactive guideline provision concerning offenders who present zero criminal history points. Paolucci is eligible for consideration for a reduction under this provision, but the government suggests that the Court in the exercise of its discretion should deny relief.

**I.      Background.**

    **A.      Criminal Conduct.**

Dino Paolucci orchestrated an elaborate "pump and dump" scheme, in which he and a number of confederates engaged in extensive and complex stock manipulation to artificially inflate the price of stocks and then sell the shares to unknowing buyers. The

scheme caused losses in the market of at least $25 million, and Paolucci himself profited to the tune of at least $3.8 million.

Paolucci and his co-schemers successfully manipulated the stock of several public companies, including AGR Tools Inc. ("AGRT"), LiveWire Ergogenics, Inc. ("LVVV"), YaFarm Technologies ("YFRM"), Resource Ventures, Inc. ("REVI"), and Medical Cannabis Payment Solutions ("REFG"). The securities of these companies were publicly quoted on the OTC Bulletin Board ("OTCBB") and/or OTC Markets platforms, including two of its markets: OTXQB and OTC Pink (formerly referred to as the "Pink Sheets"), or their predecessors.

Paolucci, a stock promoter, orchestrated a scheme in which his co-schemers gained control of the vast majority of restricted shares (which cannot be freely traded in the market) and free trading shares (which can be freely traded) of companies that traded on the over-the-counter ("OTC") markets, in order to control the timing, volume, and price of stock available for trading. This then enabled the schemers to make maximum profits by selling the shares at inflated prices during stock promotions they orchestrated. They used coordinated trades among scheme participants in conjunction with false and misleading press releases to create the false appearance of interest in the companies, to increase stock prices and sales. Paolucci did not own any stock himself—the stock was owned by his co-schemers. He did, however, receive 60 percent of the proceeds of the stock sales.

Paolucci, a Canadian citizen, oversaw virtually every aspect of the scheme. He demanded proof of who held which stock and where the stocks were held, had an

intermediary accept stock and payments from his co-schemers to avoid detection, directed when false and misleading statements would be included in press releases, and controlled the timing of trades and the accounts out of which those trades would take place. He and his co-schemers concealed their stock ownership and manipulations, as well as the profits they were making as a result of these manipulations, from regulators and the investing public, by using nominee corporations and individuals, as well as intermediaries to buy and sell stock, deal with vendors, receive proceeds from manipulations, and distribute those proceeds. At various times, Paolucci also used the false identity of Kevin Hood to disguise Paolucci's own participation in stock deals. The use of these corporate and individual nominees and intermediaries impeded the U.S. Securities and Exchange Commission (the "SEC") and investors from being able to determine the identity of persons receiving the proceeds of the manipulations, and also made it less likely that victims would be able to file actions against the schemers to obtain injunctive relief, civil monetary penalties, and other relief.

Through nominees, Paolucci himself received approximately $3.8 million between mid-June 2012 and September 2013. The loss to others could not be pinpointed, given the large volume of fraudulently traded stock and huge number of victims in the market. But the total loss was estimated as between $25 million and $65 million, as follows:

> The total loss of the charged and stipulated conduct is between $25,000,000.00 and $65,000,000.00. The stipulated loss is based upon a calculation of the actual loss in this case. This actual loss was determined by calculating the sum of the value of the shares of AGRT, LVVV, YFRM, REVI, and REFG traded during the period over which each stock was manipulated.

PSR ¶ 72.

Pursuant to a plea agreement, Dino Paolucci pleaded guilty to Counts 22, 23, 24, and 25 of an indictment alleging securities fraud based on his conduct, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

### B.     Sentencing.

As part of his plea agreement the parties agreed that the base offense level was 7, that 22 levels were added because the fraud loss from the scheme was between $25 million to $65 million, and that a two-level increase for mass marketing applied, and that the defendant was entitled to a three-level decrease for acceptance of responsibility. The final offense level of 28, criminal history category I resulted in an advisory guideline range of 78-97 months.

On December 10, 2019, Judge Robreno sentenced Paolucci to 84 months in prison, and imposed the $2 million forfeiture judgment that the defendant had agreed to in the plea agreement. As the defendant was a Canadian citizen who is subject to removal, no supervised release was included in the sentence. No restitution was ordered as based on the sheer number of stock sales it was deemed impractical to identify individual victims.

Under the terms of the plea agreement, if the defendant paid the full forfeiture amount prior to the time the U.S. Attorney's Office received notification from the Office of International Affairs that the defendant had applied for transfer to a Canadian prison, the U.S. Attorney's Office would not object to the transfer. The defendant, who received much of his money prior via intermediaries, did not pay any money towards his forfeiture obligation – apparently because his family did not come through as expected despite

apparently having the resources to do so – but did apply for transfer to a Canadian prison. Our office objected, and the transfer was not approved.

Paolucci is serving his sentence at FCI Elkton, with a minimum release date of July 22, 2025. He has served approximately 53 months, and has credit for good conduct time of approximately 12 months, for total time served of approximately 65 months. He has committed one minor disciplinary infraction, on January 19, 2021, for failing to obey an order.

## II.     Request for Compassionate Release.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of

title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[1]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

In his motion, Paolucci avers that the guideline policy statement is not binding, and that this Court may grant relief based on any circumstance it deems extraordinary. Paolucci then proceeds to reargue the appropriate sentence in this case, canvassing each

---

[1] The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States*, 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

Further, this Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Aguibi*, 858 Fed. App'x 485, 486 n.2 (3d Cir. 2021) (not precedential; per curiam) ("To the extent that Aguibi requested a transition to home confinement, the Bureau of Prisons has the sole authority to place a prisoner in home confinement."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021); *United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021); *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.).

of the 18 U.S.C. § 3553(a) factors, as if this were an initial sentencing proceeding and this Court were free at any time to revisit the case.

This approach is wrong. To be sure, prior to November 1, 2023, the Sentencing Commission had not updated its pertinent policy statement, § 1B1.13, since Congress amended the compassionate release statute in 2018. Accordingly, courts held that the earlier policy statement was not binding during that period, but could be considered as advisory. *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021).

But significantly, the Commission has now updated the policy statement, to address prisoner-filed motions authorized by the 2018 amendment, and specify the circumstances that qualify as "extraordinary and compelling." Under the compassionate release statute, this policy statement must now be deemed binding. The statute, § 3582(c)(1)(A)(i), states that a reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission . . . ." The amended policy statement is now applicable. *See Dillon v. United States*, 560 U.S. 817, 821 (2010) (holding that under the materially identical provision in 18 U.S.C. § 3582(c)(2) regarding application of retroactive guideline amendments that the criteria stated by the Sentencing Commission are binding). *See also, e.g., United States v. Diamond*, 2023 WL 8724142, at *2 (S.D. Iowa Dec. 19, 2023) (Rose, C.J.) (the newly amended compassionate release guideline is now binding, as "under § 3582(c)(1)(A)'s plain language, any reduction in sentence under this section must be 'consistent' with the Commission's policy statement in USSG § 1B1.13."); *United States v. Eggleston*, 2023 WL 8716876, at *4 (D. Md. Dec. 18, 2023) (Hollander, J.) (same).

Compassionate release is an extraordinary remedy that stands as a narrow exception to the basic rule that federal sentences are determinate and final. The type of reevaluation Paolucci seeks is not permitted. Rather, he is eligible for consideration only if he presents one of the extraordinary circumstances described in Section 1B1.13, which addresses medical, family, and age circumstances, as well as inmates who suffer abuse in prison. Paolucci does not present any of these circumstances, or anything comparable to them.

Besides his general discussion of 3553(a) factors, he addresses three subjects, none of them sufficient to allow consideration for compassionate release.

1.  Paolucci asserts that the guideline range in this case would be lower, based on the decision in *United States v. Banks*, 55 F.3d 246 (3d Cir. 2022), that the definition of "loss" in U.S.S.G. § 2B1.1 encompasses only actual loss, not intended loss. That is not a basis for compassionate release; the amended guideline makes clear that a change in law is not an extraordinary circumstance, except in limited circumstances not present here (i.e., where the defendant has served at least 10 years in custody on a sentence that would be grossly disparate today). § 1B1.13(b)(6), (c). And Paolucci's sentence in fact would be the same today. As explained earlier, his sentence was indeed based on actual loss, not intended loss.[2]

---

[2] We note that the decision in *Banks* rested not on the seriousness of offenses that involve intended loss, but simply application of a rule of administrative law that agency commentary to a regulation may not expand on an otherwise unambiguous regulation. Whether that rule even applies to application of the Guidelines has divided the Circuits.
*continued . . .*

2. Paolucci states that he may not receive time credits allowed by the First Step Act for participation in recidivism reduction programs, because he is subject to removal and no sentence of supervised release was imposed. That too is not an extraordinary situation described in the controlling guideline. *See, e.g.*, *United States v. Singh*, 2023 WL 9004911, at *2 (E.D. Mich. Dec. 28, 2023) (Drain, J.) (the inability to apply FSA time credits is not a circumstance that is "similar in gravity" to the reasons listed in the guideline); *United States v. Pina*, 2023 WL 8759830 (S.D.N.Y. Dec. 19, 2023) (Marrero, J.) (same).

3. Finally, Paolucci seeks relief based on the harshness of the conditions in prison during the pandemic, involving occasional lockdowns and other ameliorative measures taken to mitigate the spread of COVID-19. But these circumstances are not unique to him, but rather were faced by all inmates as part of BOP's strenuous campaign to battle the pandemic. Courts in this Circuit have therefore consistently denied such a claim for relief. A panel of the Third Circuit did so in *United States v. Robinson*, stating, "Robinson did not point to any health conditions placing him at a higher risk of serious illness from COVID-19, nor did he describe any circumstances setting him apart from other incarcerated individuals. Robinson's generalized concerns are insufficient to constitute extraordinary and compelling reasons. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that 'the mere existence of COVID-19 in society and the

---

In cases affected by *Banks*, the government will readily seek an upward variance so that the sentence captures the true seriousness of the offense. But that would not be necessary here, where the case involved actual loss.

possibility that it may spread to a particular prison alone cannot independently justify compassionate release')." *United States v. Robinson*, 2022 WL 11005332, at *1 (3d Cir. 2022) (not precedential). *Accord United States v. Hernandez*, 2022 WL 910091, at *5-6 (E.D. Pa. Mar. 28, 2022) (Leeson, J.) (prison conditions during the pandemic do not present grounds for compassionate release absent a showing of unique harm to the petitioner); *United States v. Gupton*, 2022 WL 3448233, at *2 (E.D. Pa. Aug. 16, 2022) (Beetlestone, J.); *United States v. Brunson*, 2022 WL 3756198, at *5 (E.D. Pa. Aug. 30, 2022) (Jones, J.); *United States v. Johnson*, 2021 WL 4120536, at *3 (S.D.N.Y. Sept. 9, 2021) ("[A]lthough the pandemic has made prison conditions harsher than usual, those are circumstances that all inmates have had to endure. While the Court does not minimize those difficulties, they do not rise to the level of extraordinary and compelling.").

In sum, Paolucci does not present any "extraordinary and compelling reason" allowing consideration for compassionate release, and his motion for that relief should be denied.

### III.    Motion for Application of Retroactive Guideline Amendment.

Separately, Paolucci seeks relief based on a retroactive amendment to the Guidelines. This matter is controlled by a different statute, 18 U.S.C. § 3582(c)(2).

In Part B, Subpart 1 to Amendment 821 to the Sentencing Guidelines, the Sentencing Commission added what now appears in Section 4A1.1(c), providing a 2-

offense-level reduction for many offenders who present zero criminal history points. The new provision states:

> § 4C1.1. Adjustment for Certain Zero-Point Offenders
>
> (a) ADJUSTMENT.—If the defendant meets all of the following criteria:
>
> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;
>
> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
>
> (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and
>
> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;
>
> decrease the offense level determined under Chapters Two and Three by 2 levels.

On August 24, 2023, the Commission decreed that this change applies retroactively. The Commission further directed that a court granting relief may not order

the release of a defendant to occur any earlier than February 1, 2024. *See* § 1B1.10(e)(2) (Nov. 1, 2023).

Upon application of the new provision to Paolucci, who had zero criminal history points, his offense level is reduced by 2 levels to 26, and his advisory guideline range is reduced to 63 to 78 months.

Paolucci may therefore seek relief under 18 U.S.C. § 3582(c)(2), that provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

In Section 1B1.10 of the Guidelines, the Sentencing Commission has identified the amendments which may be applied retroactively pursuant to this authority, including Part B, Subpart 1 of Amendment 821, and articulated the proper procedure for implementing those amendments.

In *Dillon v. United States*, 560 U.S. 817 (2010), the Supreme Court addressed the process for application of a retroactive guideline amendment, emphasizing that Section 1B1.10 is binding. The Court declared: "Any reduction must be consistent with applicable policy statements issued by the Sentencing Commission." *Id.* at 821. The Court required district courts to follow a two-step approach:

> At step one, § 3582(c)(2) requires the court to follow the Commission's instructions in §1B1.10 to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized. Specifically, §1B1.10(b)(1) requires the court to begin by "determin[ing] the amended guideline range that would have been applicable to the defendant" had the relevant

amendment been in effect at the time of the initial sentencing. "In making such determination, the court shall substitute only the amendments listed in subsection (c) for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected." *Ibid.*

Consistent with the limited nature of § 3582(c)(2) proceedings, §1B1.10(b)(2) also confines the extent of the reduction authorized. Courts generally may "not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) . . . to a term that is less than the minimum of the amended guideline range" produced by the substitution. §1B1.10(b)(2)(A). . . .

At step two of the inquiry, § 3582(c)(2) instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case.

*Dillon*, 560 U.S. at 827.

Consistent with these rules, as noted, Paolucci is eligible for a reduction in sentence, to a term no lower than 63 months, which is the bottom of the new guideline range produced by application of the new zero-points provision. Here, where the original range was 78 to 97 months, and Paolucci was sentenced to 84 months, an equivalent sentence within the new range would be 68 months.

But the government suggests that the Court, in the exercise of its discretion, should deny relief. *See, e.g.*, *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998) ("[t]he grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced); *United States v. Styer*, 573 F.3d 151, 154-55 (3d Cir. 2009) (reduction is denied to eligible defendant based on nature of original criminal conduct). Paolucci may have been a "zero point" offender, in that he had no previous criminal conviction, but he engaged in

very extensive criminal conduct in this case. This was far from a one-time, first-time offense. To the contrary, the crimes continued for at least a full year, involving a labor-intensive and intricate scheme that involved myriad steps and daily commitment. The result was losses inflicted on numerous others in the tens of millions of dollars. In our view, this is not the record of the type of offender deemed worthy of more lenient treatment under the new zero-point provision, and the original sentence of 84 months remains fully appropriate to address the defendant's conduct. The government accordingly recommends that the request for a reduction under Section 3582(c)(2), like the motion for compassionate release, be denied.

    Respectfully yours,

    JACQUELINE C. ROMERO
    United States Attorney


    */s Robert A. Zauzmer*
    ROBERT A. ZAUZMER
    Assistant United States Attorney
    Chief of Appeals


    */s Judy G. Smith*
    JUDY G. SMITH
    PATRICK J. MURRAY
    Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served by first-class mail, postage prepaid, upon:

>Mr. Dino Paolucci
>No. 42735-066
>FCI Elkton
>P.O. Box 10
>Lisbon, OH  44432

>*/s Judy G. Smith*
>JUDY G. SMITH
>Assistant United States Attorney

Dated:  January 2, 2024